UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DOES 1, 2, 3, 4, and 5, | )<br>)<br>) |
| *Plaintiffs*, | )<br>) |
| v. | ) Case No. 3:10-cv-00685-JCH<br>) |
| ENFIELD PUBLIC SCHOOLS, | ) Date: May 19, 2010<br>) |
| *Defendant*. | )<br>)<br>) |

**PLAINTIFFS' REPLY ON THE MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT........................................................................................................................1

    I.     Defendant Distorts the Law By Claiming That *Agostini* Sets Forth the Establishment Clause Test for All Claims in This Case. ..........................................1

    II.    The Cases That Have Allowed the Use of Churches by Public Schools Are Distinguishable. ...................................................................................................2

    III.   The Coercion Test Prohibits the Government Not Only from Subjecting People to Religious Exercises, But Also from Forcing Religion upon Them in Any Manner ........................................................................................................4

         A.     Religious Imagery Can Be As Coercive As Religious Speech....................4

         B.     Religious Imagery Will Be Central to the Schools' Graduations................5

    IV.   The Schools Have Conveyed a Governmental Message of Endorsement of Religion..............................................................................................................7

    V.    Graduations in the Cathedral Still Foster Excessive Entanglement.........................8

    VI.   Tax Funds Are Used for the Graduations in Violation of *Agostini* .........................9

    VII.  This Practice Violates the Connecticut Constitution's Article Seventh .................9

    VIII. Plaintiffs Are Entitled to a Preliminary Injunction ...............................................10

CONCLUSION....................................................................................................................10

Holding graduations at the Cathedral has put Plaintiffs to a constitutionally forbidden choice: either forgo a once-in-a-lifetime moment, or submit to immersion in a religion-permeated space that will make them feel uncomfortable, excluded, and like outsiders. The Schools have not challenged those essential facts, nor could they. Instead, they have misstated the law, and their own factual assertions would not, even if true, overcome the constitutional violation here.

## ARGUMENT

**I.      Defendant Distorts the Law By Claiming That *Agostini* Sets Forth the Establishment Clause Test for All Claims in This Case.**

Defendant relies almost solely on *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997), to explain Establishment Clause law. *See* Opp'n 6-9. But *Agostini* only sets forth the test for cases in which the sole claim is that government is providing unconstitutional public aid to a religious institution. *Accord Mitchell v. Helms*, 530 U.S. 793, 837 (2000) (O'Connor, J., concurring).[1] *Agostini* stands for the limited point that it is constitutional to provide government aid to a religious institution if (1) the aid is neutrally allocated; (2) the aid is not actually used to support religion; and (3) certain other factors are met, including that government monitors use of the aid and that the aid supplements instead of supplants the institution's own resources. *Agostini*, 521 U.S. at 209-12, 225-26, 228-29, 234; *accord Mitchell*, 530 U.S. at 848-49, 855-58, 860-63, 865, 867 (2000) (O'Connor, J., concurring).

*Santa Fe Independent School District v. Doe*, 530 U.S. 290, 302, 305-07, 310 (2000), decided after *Agostini*, confirmed that the Establishment Clause continues to prohibit governmental religious coercion and religious endorsement and that divisiveness remains a factor to consider. *See also*, *e.g.*, *Skoros v. City of New York*, 437 F.3d 1, 25-31 (2d Cir. 2006)

---

[1] Justice O'Connor's concurrence represents the holdings in *Mitchell*. *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 419 (2d Cir. 2001).

1

(applying endorsement test). Likewise, *Agostini* did not disturb prior case law concerning governmental delegation of authority to religious institutions. *See*, *e.g.*, *Commack v. Self-Serv. Kosher Meats v. Weiss*, 294 F.3d 415, 429 (2d Cir. 2002). Accordingly, the Second Circuit has repeatedly relied largely on pre-*Agostini* decisions in adjudicating recent Establishment Clause cases where the principal claim was not public funding of a religious institution. *See Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 493-96 (2d Cir. 2009); *Skoros*, 437 F.3d at 16-41; *Commack*, 294 F.3d at 425-32.

Plaintiffs here allege multiple theories, in addition to funding, to show that the Schools' graduations in the Cathedral violate the Establishment Clause. This case involves religious coercion, endorsement, and the delegation of public power to a church, where *Agostini* did not. Even with respect to funding, here—unlike in *Agostini*—public funds are being used to support public events in a religious environment, and there is evidence that the Cathedral was chosen not for neutral and secular reasons but due to lobbying by a religious organization.

## II. The Cases That Have Allowed the Use of Churches by Public Schools Are Distinguishable.

The rest of Defendant's legal argument on the merits rests almost exclusively on three district-court opinions outside the Second Circuit. The two published opinions that Defendant discusses at length both considered the use of non-religious space where religious iconography was not displayed. In *Porta v. Klagholz*, 19 F. Supp. 2d 290, 303 (D.N.J. 1998), the court explained that a church leased by a public charter school contained no religious iconography in the areas used by the school, that there were no religious images or messages on the exterior of the church, and that students used a separate entrance that did not require them to pass by a sign for the church. Likewise, in *Thomas v. Schmidt*, 397 F. Supp. 203, 207 (D.R.I. 1975), *aff'd mem.*, 539 F.2d 701 (1st Cir. 1976), public-school students were temporarily housed in space leased

from a church, but the space contained no religious iconography and was physically set off from the part of the building used by a Catholic school, including by separate entrances and lavatories.

Defendant also relies extensively on an unpublished district-court opinion that is incorrect on the law, still subject to review, and distinguishable: *Does v. Elmbrook Joint Common Sch. Dist. No. 21*, No. 09-c-0409, Docket Entry 71 (E.D. Wis. Sept. 15, 2009). Indeed, the court in *Elmbrook* expressed great uncertainty about what the law was and whether its ruling was correct. *See id.* at 22-23. Cross-motions on summary judgment are still pending in that case (Docket Entries 44, 52), and any final ruling is subject to appeal (and will be appealed if it is adverse to the plaintiffs). Meanwhile, there is stronger evidence of religious endorsement here, including the successful lobbying efforts by a religious group, the Board chair's statements to graduating seniors about the importance of prayer, and the availability of more attractive alternative facilities. *See* Pls.' Mem. at 32.

By contrast, *Lemke v. Black*, 376 F. Supp. 87 (E.D. Wis. 1974), is more applicable than *Porta* or *Thomas*, and its reasoning is more persuasive—and more in line with Supreme Court rulings—than *Elmbrook*'s. The court in *Lemke* almost perfectly foreshadowed the coercion analysis that the Supreme Court would later apply—down to the fact that attendance at events like high-school graduations is "not truly voluntary." *Compare id.* at 89-90, *with Santa Fe*, 530 U.S. at 312, *and Lee v. Weisman*, 505 U.S. 577, 595-96 (1992). The court also relied partly on coercion concerns in *Reimann v. Fremont County Joint School District No. 215*, Civil No. 80-4059, at 9 (D. Idaho May 22, 1980) (Ex. 117). Morevoer, in *Spacco v. Bridgewater School Department*, 722 F. Supp. 834, 842-43 (D. Mass. 1989), the court prohibited the placement of public-school children in church facilities where substantial religious iconography was on display. And the court's conclusion in *Musgrove v. School Board* that holding a public-school

3

graduation in a church, underneath a large cross, would violate the Establishment Clause is fully in keeping with the foregoing three decisions. *See* 608 F. Supp. 2d 1303, 1305 (M.D. Fla. 2005).

### III. The Coercion Test Prohibits the Government Not Only from Subjecting People to Religious Exercises, But Also from Forcing Religion upon Them in Any Manner.

The Schools contend that where "no religious exercise takes place" there is little danger of coercion. Opp'n at 14. The Supreme Court has enunciated the Establishment Clause bar on religious coercion in much broader terms, however. In *Lee*, the Court stated, "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. at 587. In *Zorach v. Clauson*, 343 U.S. 306, 314 (1952), the Court expounded upon the many facets of this prohibition: "Government may not . . . force one or some religion on any person," or "thrust any sect on any person," or "make a religious observance compulsory," or "coerce anyone to attend church, to observe a religious holiday, or to take religious instruction." And in *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947), the Court specifically noted that no government entity "can force [or] influence a person to go to or remain away from church against his will."[2]

#### A. Religious Imagery Can Be As Coercive As Religious Speech.

The Schools counter that there is no coercion because Plaintiffs do not have to "participat[e] in a religious practice," and cite to cases involving school-sponsored prayer for support. Opp'n at 14-15. But those cases did not require participation either. In *Lee*, for example, the Court held that simply having a prayer at graduation was coercive, even though students were not formally required to participate. 505 U.S. at 583, 593. In *Santa Fe*, the Court found coercion

---

[2] *See also Lee*, 505 U.S. at 592 ("there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools"); *Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("When the power, prestige, and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").

4

where there was no indication that students had to do anything other than listen to a prayer at a football game. 530 U.S. at 297-98, 312. Likewise, in *Engel*, 370 U.S. at 423 & n.2, 430, and *Abington Township v. Schempp*, 374 U.S. 203, 206-07, 211-12 (1963), the Court held that there was improper coercion to take part in prayers and Bible readings even though students were given the options of leaving the classrooms or remaining silent.

In all these cases, the plaintiffs merely had to listen to a prayer or religious presentation, which was typically quite short. Here Plaintiffs need not *listen* to anything religious; instead they must continuously *look* at the religious symbols that surround the graduation events—a large cross and images in the carpet—for two hours. The difference between being forced to listen to something religious and being forced to look at something religious cannot be of constitutional significance, for "[l]aw reaches past formalism." *Lee*, 505 U.S. at 595.

B.  **Religious Imagery Will Be Central to the Schools' Graduations.**

Here, even with some banners being covered or removed (*see* Opp'n at 3),[3] students will be coercively exposed to an inherently religious setting—the sanctuary of a house of worship—and substantial religious iconography. The Schools concede that there will be a large cross in whose shadow all of the graduation events will take place (which, as photos of the sanctuary demonstrate, is clearly visible even when not backlit (*see* Exs. 2-1; 3-2)), as well as religious

---

[3] The Schools' post-filing representations that they will cover the banners cannot obviate the need for an injunction. Under the voluntary cessation doctrine, "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior" (*City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)), so the "court's power to grant injunctive relief survives discontinuance of the illegal conduct (*United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *accord R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 106-07 (2d Cir. 1989)). The doctrine applies in the preliminary-injunction context. *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 n.1 (7th Cir. 2009); *see also LSG Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1153 (9th Cir. 2006); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160 (5th Cir. 1993)). Its application is appropriate here in light of the fact that, although the Schools previously asked the Cathedral to cover the banners (Ex. 145), the banners have not been covered (Exs. 2-3–2-6; 5 ¶¶ 10-12; 118-21).

pictures hanging in the lobby through which all attendees must pass.

It is not credible to contend, as the Schools do, that other items in the Cathedral are not religious. The assertion that the seven images in the carpet of the sanctuary and just in front of the altar in this house of worship (Ex. 1-25 to 1-32) have no religious meaning (Opp'n at 3; Bailey Aff. ¶ 9) is contrary to the statements of the Cathedral's own tour guides (*see* Exs. 4 ¶ 16; 133 ¶ 6), the analysis of an expert retained by Plaintiff (Ex. 134 ¶ 24, 31-37), and the text of the Bible[4] itself. Likewise belied is the claim (s*ee* Opp'n at 3; Bailey Aff. ¶ 6(d)) that the fountain in the lobby, with its distinctively shaped frame, was intended to convey no religious message (*see* Exs. 133 ¶ 5; 134 ¶¶ 9-17). Indeed, the Schools do not dispute that the water jets in the fountain form the shape of a cross. *See* Bailey Aff. ¶ 6(d). The contention that the spiral glass object hanging from the lobby's ceiling has no religious significance is also contradicted by both the statements of the Cathedral's tour guides and the expert's analysis. Exs. 133 ¶ 3; 134 ¶ 15.

Contrary to the Schools' assertion, the cross in the center of the Cathedral's façade will not merely be visible for a few seconds (Opp'n at 20). Rather, that cross will likely be at the center of attendees' attention as they watch and wait for the doors located under the cross to open before the ceremony (*see* Ex. 5 ¶ 6); attendees will then approach and enter beneath that cross (*see* Exs. 1-11; 4 ¶ 6; 5 ¶ 7); and, after the ceremony, many attendees will linger in the lobby, where the cross is also starkly visible (*see* Exs. 1-11; 5 ¶ 8). And the Schools' claim that the dove, whose shape the Cathedral takes, is not necessarily religious (Opp'n 3) is equivocal at best: the dove *is* religious here (*see* Exs. 4 ¶ 3; 133 ¶ 4; Matthew 3:13-17; Mark 1:9-11; Luke 3:21-22;

---

[4] *See* Luke 12:49 (fire); Matthew 26:27, Mark 14:23, *and* Luke 22:17-18, 20-22 (chalice); 1 Corinthians 5:7, John 1:29, 1 Peter 1:19, Acts 8:32, Exodus 12, *and* Isaiah 53 (lamb); John 10:11-18, Hebrew 13:20, *and* 1 Peter 5:4 (shepherd); Matthew 13:47-50, 14:13-21, 17:24-27, Mark 6:31-44, Luke 9:10-17, *and* John 6:5-15, 21:11 (fish); Song of Solomon 2:1, Hosea 14:4-7, *and* Luke 12:27 (lily); Revelation 5:5, *and* Hosea 11:10 (lion).

6

*see also* Ex. 134 ¶ 21) and a visitor to the Cathedral would presume as much. That the shape may be apparent only from above does not change the fact that someone might derive great discomfort from being inside a building that is itself religiously symbolic. In any event, doves also appear in the stained glass containing the cross in the Cathedral's sanctuary, as well as on the podium on the sanctuary's stage. Exs. 1-18, 1-19, 1-20; 2-1.

Finally, Defendant's attempt to minimize the religious nature of the huge white cross atop the Cathedral's roof (Ex. 1-2, 1-5, 1-7, 1-8, 1-9) by declaring that it is merely an antenna owned by a local cable company (Opp'n at 20) fails the laugh test and casts further doubt upon the credibility of Defendant's other assertions.

### IV. The Schools Have Conveyed a Governmental Message of Endorsement of Religion.

The Schools fail to refute the main facts underlying the message of endorsement sent by holding the graduations in the Cathedral: the conjunction of religious and school symbolism; the lobbying efforts by a religious group; the statements by the chair of the Enfield Board of Education regarding the importance of religion for students; and the availability of numerous nonreligious venues that could capably host the graduations. Pls.' Mem. at 31-32; Ex. 132.

With respect to alternative venues, Board Chair Stokes's cost estimates are inconsistent with information presented by the venues themselves. *Compare* Stokes Aff. ¶ 7, *with* Exs. 42 at 3-4; 132 at 3-5. Nor does Mr. Stokes explain why the MassMutual Center, which is still within the Board's pre-set budget, more spacious than the Cathedral, and more conveniently located, was not chosen. *See* Stokes Aff. ¶ 7(b); Ex. 132 at 3. Indeed, research conducted by the Schools' superintendent, as well as other information available to the Schools, confirmed the MassMutual Center's advantages. Ex. 141 at 2-4. And many other comparably equipped venues are still available and reasonably priced. Ex. 132 at 3-5. Moreover, Mr. Stokes's statement regarding the

cost of covering the high schools' football fields to hold the graduations is misleading because the bulk of that expense—a cover to protect the fields' newly renovated surfaces, costing around $30,000 (Ex. 136 at 2, 7, 9)—can be amortized over many years (*id.* at 7).

The Schools also contend that any message of endorsement can be avoided by a disclaimer inserted into the program and read before the ceremonies. Opp'n at 25. But a disclaimer does nothing to prevent or remedy the coercive imposition of religion upon students and family members at the graduations. *See Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 984-85 (9th Cir. 2003); *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1482 (3d Cir. 1996). And where, like here, a strong message of endorsement of religion is presented by the government's conduct, a disclaimer cannot neutralize that message. *See County of Allegheny v. ACLU*, 492 U.S. 573, 600 (1989); *Stone v. Graham*, 449 U.S. 39, 41 (1981); *Cooper*, 577 F.3d at 495-96; *Kaplan v. City of Burlington*, 891 F.2d 1024, 1029 (2d Cir. 1989).[5]

## V.     Graduations in the Cathedral Foster Excessive Entanglement.

Holding graduations in the Cathedral places the Schools in a position where entanglement is inevitable. The Schools have clearly delegated to the Cathedral the authority to decide what is and is not covered or removed for the graduations. The fountain in the lobby and the images on the carpet, for example, will not be covered, as Archbishop Bailey has sworn that they have no religious significance. Bailey Aff. ¶¶ 6(c), 9. But if the Schools were to require that those objects be covered, they would be intruding into the affairs of a church and making determinations about

---

[5] This case is wholly unlike public-forum cases where courts have held that religious groups may use school property that is made available to a wide variety of groups under a neutral policy. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S 98 (2001). In such cases any exposure to religion is voluntary, while here it is coerced. Moreover, in public-forum cases, schools do not convey a message of religious endorsement because they allow both secular and religious groups to use school property, while here the Schools have made a decision to hold important school events in a religious venue under circumstances suggesting favoritism of religion.

8

religious doctrine, which would also create unconstitutional entanglement. *See Commack*, 294 F.3d at 427. And contrary to the Schools' contention, Plaintiffs' evidence shows that this controversy has caused substantial divisiveness in the school community. *See* Exs. 124 ¶¶ 8-9; 125 ¶¶ 7-10; 139; 144.

## VI. Tax Funds Are Used for the Graduations in Violation of *Agostini*.

In the one area of this case where *Agostini* is actually applicable—government funding of religion—the Schools cannot pass the tests established by *Agostini* and *Mitchell*. This is not a case in which a school has leased secular space from a church. *See, e.g.*, *Porta*, 19 F. Supp. 2d at 301-04. Instead, the funds support graduations in a religious environment and advance the Cathedral's religious mission. Pls.' Mem. at 35-36. Moreover, there is evidence that the Cathedral was not chosen based on secular and neutral criteria, as the Schools decided to go back to the Cathedral in response to lobbying by a religious organization (*e.g.* Ex. 89), and the Board's Chair is a minister who has urged students to "keep God in your life" (Ex. 102 at 7).

## VII. The Church Graduations Violate the Connecticut Constitution's Article Seventh.

The Schools do not dispute that the Connecticut Constitution provides broader protection than the federal constitution and has more specific, stronger language on the separation of church and state. *See Downing v. W. Haven Bd. of Educ.*, 162 F. Supp. 2d 19, 32 (D. Conn. 2001). The Schools rely on cases that allowed public funds to be used for bussing of students to private schools, but in those cases the aid was provided directly to students, and was used for the purely secular purpose of transportation (*see Snyder v. Newton*, 161 A.2d 770 (Conn. 1960), and *Bd. of Educ. v. State Bd. of Educ.*, 709 A.2d 510 (Conn. 1998)), while here public funds are paid directly to a church and are used to support the holding of graduations in a religious environment. Moreover, none of the Schools' cases refutes Plaintiffs' argument that they are

9

being coerced to be associated with a church in violation of Article Seventh. Instead, the Schools make an inapposite analogy to community groups' use of the Cathedral: private community groups that voluntarily choose to use the Cathedral obviously cannot complain, as can students whose graduations are held there, that they are "compelled" to be associated with a church.[6]

**VIII.   Plaintiffs Are Entitled to a Preliminary Injunction.**

The balancing of harms supports Plaintiffs. If forced to attend graduation at the Cathedral or otherwise forfeit a once-in-a-lifetime moment, Plaintiffs will suffer irreparable harm. *See, e.g.*, *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). Defendant, meanwhile, will face minimal harm from an injunction, as Plaintiffs have demonstrated that there are many solid alternative facilities (*see generally* Exs. 42, 132), of which the Schools have long been aware (Ex. 141 at 2-4, 19-21). Some venues, like MassMutual Center and the Big E, can seat more than the Cathedral (Ex. 142 at 3), so no one will miss the graduations if they are moved; while another attractive option, Symphony Hall, is only slightly smaller and would allow eight guests per student to attend (Ex. 52 at CCLE289). And even if the Schools are forced to pay somewhat more for the graduations, they can obtain those funds by charging for the tickets. Ex. 39 at 4.[7]

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be granted.

---

[6] It is not clear from the Schools' assertions whether any groups that use the Cathedral are government-sponsored groups. The Schools also do not explain whether those groups use the Cathedral's sanctuary or some other, less religion-permeated space. Nor, in fact, do the Schools offer any evidence to support the claim that any other groups use the Cathedral.

[7] Not even a compelling governmental interest can justify violating the Establishment Clause. *See Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 783 n.39 (1973); *Church of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1514, 1539 (11th Cir. 1993). And surely, any interest the Schools may have in saving several thousand dollars in graduation costs is far short of compelling.

Respectfully submitted,

| /s/ Alex J. Luchenitser | /s/ David J. McGuire /s/ Sandra J. Staub | /s/ Daniel Mach |
|---|---|---|
| Ayesha N. Khan (phv03992)  Legal Director Alex J. Luchenitser (phv03993)  Senior Litigation Counsel Devin Cain (phv03991)  Steven Gey Fellow Americans United for  Separation of Church  and State 518 C St. NE Washington, DC 20002 phone: 202-466-3234 fax: 202-466-2587 *khan@au.org* *luchenitser@au.org* *cain@au.org* | Sandra J. Staub (phv03995)  Legal Director David J. McGuire  Staff Attorney (ct27523) ACLU of Connecticut 2074 Park St. Suite L Hartford, CT 06106 phone: 860-523-9146 fax: 860-586-8900 *sstaub@acluct.org* *dmcguire@acluct.org* | Daniel Mach (phv03994)  Director ACLU Program on  Freedom of Religion  and Belief 915 15th St., NW Washington, DC 20005 phone: 202-548-6604 fax: 202-546-0738 *dmach@aclu.org* |

May 19, 2010

**CERTIFICATE OF SERVICE**

    I hereby certify that on May 19, 2010, a copy of foregoing Plaintiffs' Reply on the Motion for Preliminary Injunction, as well as Exhibits 132 through 147, 149, and 150 in support thereof, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

        Respectfully submitted,

        /s/ Devin M. Cain
        Devin M. Cain (phv03991)
        Americans United for Separation of Church and State
        518 C St., NE
        Washington, DC 20002
        phone: (202) 466-3234
        fax: (202) 466-2587
        *cain@au.org*