**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DOES 1, 2, 3, 4, AND 5, | : | CIVIL ACTION NO. |
|    Plaintiffs, | : | 3:10-CV-685 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| ENFIELD PUBLIC SCHOOLS, | : | MAY 31, 2010 |
|    Defendant. | : | |

**RULING RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 5)**

**I.   INTRODUCTION**

Plaintiffs, Doe 1 and Doe 3, are students at Enfield High School. They brought

this action on May 14, 2010, together with their parents, Does 2, 4, and 5 (collectively

"Does"), seeking, inter alia, a preliminary injunction prohibiting the defendant, Enfield

Public Schools, from conducting the 2010 graduation ceremonies for the two Enfield

high schools at First Cathedral (sometimes "the Cathedral"), a Christian church. See

Complaint ("Cmplt.") (Doc. No. 1). The Does allege that holding graduation ceremonies

at the Cathedral violates the Establishment Clause of the First Amendment to the

United States Constitution and Article Seventh of the Connecticut Constitution.[1] The

graduation ceremonies are currently scheduled for June 23 and June 24, 2010.

A hearing on the Motion for Preliminary Injunction (Doc. No. 5) was held on May

24 and May 25, 2010. By request of counsel, the court, along with counsel and

members of the public, visited First Cathedral on May 25, 2010, to view it. Oral

---

[1] While Enfield Public Schools has filed a Motion to Dismiss the Complaint on justiciability grounds, see Motion to Dismiss (Doc. No. 68), it does not dispute that Does 1 and 3 have standing to seek relief regarding their 2010 graduations at First Cathedral, or that that is a justiciable issue.

argument was held on May 27, 2010.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court's findings of fact and conclusions of law are set forth below.  Based upon its findings, the court concludes, on the record before it, that the Does have clearly demonstrated a likelihood of irreparable harm in the absence of the injunction and a substantial likelihood of success on the merits that holding the graduation ceremonies at First Cathedral violates the First Amendment of the United States Constitution.

## II.      BACKGROUND[2]

### A.      Parties

Defendant Enfield Public Schools (sometimes "Enfield Schools") is a municipal school district.  It is a corporate body that maintains control of all public schools within the geographic limits of the Town of Enfield.[3]  The Enfield Board of Education ("the Board") is an elected body that has final policy-making authority and control over the Enfield schools.  The Board consists of nine members, who are elected every two-years.  Four of its nine current members were newly elected in November 2009.  The Chair of the Board is elected by fellow Board Members.  Greg Stokes currently serves as Chair.

Enfield Schools operates two high-schools: Enfield High School ("Enfield High") and Enrico Fermi High School ("Fermi High").  Enfield High's 2010 senior class has

---

[2]  Many of the facts stated herein have been stipulated to by the parties.  See Stipulation of Facts (Doc. No. 71).  Unless otherwise indicated, the facts set forth in this section are facts found by the court based on evidence in the record, the lack of evidence in the record, and the court's assessment of witness credibility.  To the extent there is evidence to the contrary, the court has rejected it.

[3]  The Town of Enfield is located in Hartford County, 18 miles north of Hartford and 8 miles south of Springfield, Massachusetts.

approximately 202 students.  Fermi High's 2010 senior class has approximately 249 students.

Doe 1 is a student and member of the class of 2010 at Enfield High School.[4] See Decl. of Doe 1 (Exh. 5) at ¶ 2.  Doe 1 is agnostic and will likely not attend his/her graduation if it is held at First Cathedral.  S/he attended the 2009 ceremonies held at First Cathedral, perceived a "pervasively religious environment," and concluded that "it would be difficult, if not impossible, for me to attend my own graduation if it were held at the Cathedral."  Id. at ¶¶ 17, 18.  Doe 2 is Doe 1's parent and a resident of the Town of Enfield.  See Decl. of Doe 2 (Exh. 6) at ¶ 1.  Doe 2 does not subscribe to the Christian faith.  Id. at ¶ 6.  If Doe 1 decides not to attend graduation, Doe 2 feels s/he will be "deprived of a once-in-a-lifetime opportunity to celebrate my child's high-school graduation."  Id. at ¶ 5.  If Doe 1 does decide to attend graduation, Doe 2 feels s/he will be "forced to submit to a religious environment that . . . will make me feel extremely uncomfortable and offended" and that "religious beliefs to which I do not subscribe are being imposed on me."  Id. at ¶ 6.

Doe 3 is also a student and member of the class of 2010 at Enfield High School. See Decl. of Doe 3 (Exh. 7) at ¶ 2.  Doe 3 subscribes to the Jewish faith and will not attend the graduation ceremony if it is held at First Cathedral because s/he would "feel that the Cathedral is proselytizing its Christian beliefs . . . through its scriptures and symbols."  Id. at ¶¶ 3, 8, 12.  Doe 4 is a parent of Doe 3.  See Decl. of Doe 4 (Exh. 8) at

---

[4] The Does moved the court to proceed pseudonymously.  See Motion for Leave to Proceed Using Psuedonyms (Doc. No. 6).  Upon an assessment of the relevant factors identified by the Second Circuit, see Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 190 (2d Cir. 2008), the court granted the Motion.  See Minute Entry for May 21, 2010 Prehearing Conference (Doc. No. 73).

¶ 1.  Doe 4 does not have firm religious beliefs and has declared that s/he would "feel like an outsider if I attend graduation at First Cathedral, as I feel that when one steps into someone else's church, one gets the feeling that one should be part of their religion."  Id. at ¶¶ 2, 3.  Doe 5 is Doe 3's step-parent.  See Decl. of Doe 5 (Exh. 9) at ¶ 1.  Doe 5 has declared that s/he "will be deprived of a once-in-a-lifetime opportunity to celebrate Doe 3's graduation" because Doe 3 will not attend graduation if it is held at First Cathedral.  Id. at ¶ 2.

B.      First Cathedral[5]

First Cathedral is a Christian church in Bloomfield, Connecticut.  The pastor at First Cathedral is Archbishop LeRoy Bailey, Jr. ("Bailey"), who took an active role in designing the church.  The Cathedral has the capacity to seat three thousand (3000) individuals in its main sanctuary.

In front of the Cathedral, a large sign is prominently displayed on the corner of Blue Hills Avenue and Wintonbury Avenue.  It states, in large letters, "First Cathedral."[6]  A very large cross rises above a stained glass cupola on top of the Cathedral's roof.  This cross is visible from all angles of the Cathedral's surroundings.  The cross is a symbol of the Christian faith of the members of the Cathedral.  Stipulations ("Stip.") (Doc. No. 71) at ¶ 17.  The images portrayed in the stained-glass panels of the cupola are not readily identifiable from ground level.

_____

[5] The court's findings with regard to the description of First Cathedral's facilities are based in part upon observations that the court made during its May 25, 2010 site visit.

[6] Driving from Enfield, one approaches the First Cathedral from the east, traveling toward the front of the Cathedral where this sign is located.

Although there are numerous side exits to the Cathedral, there is one main entrance to the Cathedral that leads to a large lobby.  Above the main entrance doors, there is a large cross (approximately 25 feet high and 10 feet wide) embedded within the window panes.  Exh. 1-11.  A hexagonal figure surrounds the upper part of the cross, and the window panels on the inside of the hexagonal figure are stained-glass and depict a group of people with arms raised towards the sun that is casting down light beams from above.  Exhs. 1-10, 1-11, 1-12.

After entering the Cathedral, students and family members attending graduation ceremonies pass through the Cathedral's lobby.  Some students and families also gather in the lobby before or after the ceremonies.  The cross over the front door is visible from inside the lobby.  The lobby of First Cathedral contains stairs that lead down to the main sanctuary.  These stairs are divided by a large fountain that could be perceived to be a representational shape of a tomb.  Exh. 1-13.  The jets that supply the water in the fountain are arranged in the shape of a cross; there are seven vertical jets, and four horizontal jets that cut across the vertical jets in a similar manner to that in which the horizontal beam of a cross intersects with the cross's vertical beam.  Id.  The lobby also contains a gift shop of Christian items.  There are also large banners hung in the lobby, which, during the 2009 graduations, contained religious messages.  One banner has quoted Psalms 100:4: "Enter into His gates with thanksgiving, and into His courts with praise.  Be thankful to Him, and bless His name."  Exh. 1-16.

From the lobby, students and parents attending the 2010 graduation ceremonies will proceed either down the lobby stairs to the main level of the sanctuary, or up the lobby stairs to the balcony level.  Exh. 1-13.  A large hallway spans the entire

circumference of both the lower and upper levels of the sanctuary, and those attending graduation will have to enter this hallway in order to enter the main level of the sanctuary or the balcony.  Both the lower and upper hallways, as well as the lobby walls, contain many artistic wall hangings.  Although some of the wall hangings can be characterized as secular, the majority of the hangings contain content that is religious, and plainly Christian.[7]  There are, for example, numerous pictures depicting biblical scenes, such as the birth of Jesus Christ.  On the first floor, there is a framed poster of the Lord's Prayer.  Other pictures may also be characterized as religious, though their religious character is more subtle.  In addition, a large number of the wall hangings contain permanent metal placards on their frames; these placards quote biblical passages and cite to passages from the Psalms, the Gospel, or the Proverbs.

From the hallways, those attending the 2010 graduation enter the main sanctuary.  This main sanctuary is where religious services are performed, and where the main graduation ceremonies will take place.  The sanctuary is vast, with a large number of individual, cushioned seats on both the main level and the balcony.  There are numerous video displays that can stream live video of the graduation ceremony, or pre-recorded material.  The actual ceremonies will take place on the stage of the sanctuary, which is slightly elevated from the main level.  Exh. 1-25.

On the carpet on the floor in front of the main stage are seven images.  These images are of a fire, a fish, a lion, a shepherd's hand and staff, a lamb, a lily, and a

---

[7] While Archbishop Bailey acknowledged that "around the building we have considerable art," he testified that "most of it is not religious at all, it is eclectic."  Bailey Dep. at 23.  This court finds to the contrary.

chalice.  Exhs. 1-25-1-32.  These images are visible both from the stage area and from some areas of the audience seating.  These images all can be religious.[8]

The stage area contains a podium that is fronted with the image of a dove.  Exh. 1-20.  The back of the stage area is elevated and surrounded by seats that normally hold the First Cathedral choir.  Those seats will be used for the graduates during the 2010 ceremonies.  A large pentagonal stained glass panel is situated behind the center of the stage and above the center choir seats.  Exh. 1-17.  The central feature of the stained glass panel is a large cross, estimated at approximately twenty-five (25) feet tall and ten (10) feet wide.  Id.  There is also a dove visible within the stained glass.  Exh. 1-20.  During church ceremonies, First Cathedral turns on a light behind the central stained glass panel which illuminates the stained glass.  See Exh. 1-17.  During the 2010 ceremonies, this backlight will remain off.  Even with the backlight off, it is plainly apparent from the audience's viewpoint that the panel contains a large cross.

The Cathedral's baptistry – the area where baptisms are performed – is located in a recess adjacent to the seating area and underneath the cross.  The baptistry, the water filling it, and the two microphones in it are visible to people sitting in the choir balcony.  On the edge of a table just below the front of the baptistry facing the audience, is written, in size visible from the choir, the words "This do in remembrance of me."

Two additional items deserve mention.  The large cross behind the stage is flanked by two large banners (approximately twenty-five feet long) that hang on the rear

---

[8] See Kirkpatrick Decl., Exh. 134 at ¶¶ 31-37 (explaining religious significance of carpet images).

wall of the sanctuary.  One banner states "Jesus Christ is Lord," and lists the words "Savior, Redeemer, Deliverer, Truth, Good Shepherd, Great High Priest, Head of the Church, Bread of Life, Lamb of God, King of Kings, Lord of Lords, Prince of Peace." Exh. 1-22.  The other banner states "I am God" and lists various phrases, such as "Jehovah Yireh (one provider)" and "Jehovah Shalom (one peace)".  Exhs. 1-24, 4 at ¶ 12.

> C.     Previous Public School Graduations at First Cathedral

Fermi High held its graduation ceremonies at First Cathedral in 2007, 2008, and 2009.  Enfield High did so in 2008 and 2009.  Enfield Schools' decision to begin using First Cathedral for its graduations largely stemmed from the fact that Fermi High performed construction on its athletic fields during the 2006-2007 school year, and that Enfield High performed similar construction during the 2007-2008 school year.  In light of the renovation projects, a temporary alternative site needed to be identified for use for the graduation ceremonies that had been held at the high school grounds for decades.  First Cathedral was selected.

On January 18, 2007, John Gallacher, Superintendent for the Schools, wrote to the Cathedral on behalf of Enfield and two other school districts, asking that the banners be removed during graduations.  Exh. 145.  They were not removed.  Exh. 5 at ¶¶ 10-11.  Further, before the Board decided to hold the 2007 Fermi High graduation at the Cathedral, a member of a graduation-site advisory committee represented to the Board that religious items at the Cathedral would be covered or removed for the graduation.  Exh. 29 at 6.  This was not in fact done for any Enfield graduation at the Cathedral.

-8-

Before the doors of First Cathedral opened for the 2009 ceremony, the graduating seniors and their guests had to wait outside the Cathedral's lobby, in front of the large cross that adorns the main entrance.[9]  From this vantage point, the gift shop (which was closed) and the religious items inside the shop were plainly visible.  Doe 1 noted several crosses embedded within the windows of the main entrance, a cross-shaped fountain immersed within a tomb-shaped pool of water, and the numerous religious paintings in the lobby.  Exh. 5 at ¶¶ 6-8.  The 2009 ceremonies took place in the main sanctuary.  Doe 1 noted the large cross behind the main stage.  Id. at ¶ 9; Exh. 2-1.  The two banners described supra, at 7-8, were also plainly visible.  Id. at ¶¶ 10-11.  Furthermore, like the large cross, the banners were in the direct line of sight of parents and other guests watching the graduates on the stage.  As guests waited for the graduates to enter, two jumbo screens behind the stage read, "Welcome to the First Cathedral, A Church for All People, This is God's House Where Jesus Christ is Lord."  Exh. 5 at ¶ 13; exh. 2-5.  Each of the images within the carpet described supra, at 6-7, were plainly visible.  Id. at ¶ 14.

Enfield High placed a disclaimer in small print[10] on the back of the 2009 graduation program that stated, "The graduation for Enfield High School Class of 2009 is being held at First Cathedral because the facility met all the requirements for the ceremony.  The selection of this venue is not an endorsement of a specific religion in

---

[9]  The court's findings with regard to the description of the 2009 graduation ceremonies are based upon both DVD recordings of those graduations, Exhs. 120, 121, and the Declaration of Doe 1, who attended the Enfield High School ceremony in 2009, see Exh. 5.

[10]  The font appears to be no more than size six.

general by the Enfield School District." Exh. J-2. Apparently, no disclaimer was placed on the Fermi High programs. Exh. J-4.

Other schools in the Hartford-area have also held graduations at First Cathedral. Stip. at ¶ 9. Windsor High School held its graduation at First Cathedral from 2001 through 2007, and also in 2009; South Windsor High School held its graduation at First Cathedral from 2006 through 2009; East Hartford High School did so in 2009; and the Metropolitan Learning Center did so from 2007 through 2009. Id. Between December 2009 and February 2010, the other four school districts that had been holding graduations at First Cathedral decided not to hold their 2010 graduations there. Stip. at ¶ 20.

Opposition to Enfield Schools (and other school districts) holding graduations at First Cathedral was voiced as early as 2006. On December 11, 2006, the American Civil Liberties Union ("ACLU") of Connecticut, one of the counsel for the plaintiffs, sent a letter to Enfield Schools, objecting to the plan to hold Enrico Fermi's 2007 graduation at First Cathedral, and asking that the ceremony be moved to a secular location. At this time, the ACLU also sent similar letters to other school districts that were then holding graduations at the Cathedral. On May 12, 2009, Americans United for Separation of Church and State ("Americans United"), one of the counsel for plaintiffs in this case, sent a letter to Enfield Schools objecting to the holding of graduations at the Cathedral and asking Enfield Schools to discontinue the practice.

D.    Decision to Hold 2010 Graduations at First Cathedral Church

In advance of the Enfield Board selecting a location for the two 2010 graduation ceremonies, the ACLU of Connecticut, American's United, and the ACLU Program on

Freedom of Religion and Belief (together, counsel for the plaintiffs) sent a joint letter to the Enfield Schools advising that the three organizations had been retained to file litigation if Enfield did not agree to stop holding graduations at the Cathedral.  On October 22, 2009, plaintiffs' counsel also sent Freedom of Information Act ("FOIA") requests to Enfield Schools that related to the practice.

On December 2, 2009, counsel for Enfield Schools informed counsel for the plaintiffs that the Board had not yet made any decision as to where to hold the two graduation ceremonies for 2010.  Enfield Schools' counsel further informed plaintiffs' counsel that the Board had not made a reservation, placed a deposit, or entered into a contract with First Cathedral regarding the 2010 ceremonies.

On January 26, 2010, the Board voted six to three to hold the two 2010 graduations at the schools themselves, regardless of whether the actual graduation site "be the field, the gyms, whatever."  Transcript of Hearing Re: Preliminary Injunction ("Tr.") at 60; Exh. 38.  This vote was made both due to financial considerations, and a desire to "bring the kids home."  Stokes, Tr. at 218.  However, the January 2010 vote was rescinded on February 23, 2010, by a vote of five to three.  See Exh. 39.

Following the February 23, 2010 Board vote, the Family Institute of Connecticut[11]

---

[11] A statement on FIC's website entitled "Our Values" states:

> The vision of the Family Institute of Connecticut is to see citizens, institutions and government acknowledge and encourage the vital role of the family and to once again see the Judeo-Christian principles that are articulated in the Declaration of Independence and U.S. Constitution, re-employed in our society and its public policy.

Exh. 87.  The Family Institute states that it is "the one group leading the fight for the religious liberty of ALL Connecticut's churches."  Exh. 95.  Archbishop Bailey serves as an advisor to the Family Institute.  Bailey Dep. 129: 9-11.

("FIC") began to increase its efforts to lobby the Enfield School Board to hold graduation ceremonies at First Cathedral.  The record indicates that Chairman Stokes was in close contact with the FIC, beginning in early March 2010, on the issue of Enfield's high school graduations.  In March and April, Stokes and FIC Executive Director Peter Wolfgang exchanged numerous electronic messages containing discussions of strategy on how to best ensure that the Enfield graduations would be held at First Cathedral.  See Exhs. 151-62.  Stokes and Wolfgang discussed which Board of Education members would most likely provide the deciding votes in their favor.  They agreed that their chances of winning the vote would largely depend on the willingness of the American Center for Law and Justice ("ACLJ") to serve as pro bono counsel for the Board, should it vote to hold the graduation at First Cathedral.  While Stokes was initially under the impression that the ACLJ would be unable to aid any Board of Education efforts to hold the graduation at First Cathedral, Wolfgang assured him that the ACLJ would represent the Enfield Schools pro bono if the Schools would agree to move their graduations back to First Cathedral.

As part of FIC's lobbying effort, three dozen members of FIC personally called all nine members of the Board to lobby on behalf of returning the graduations to First Cathedral.  Exh. 89.  Wolfgang also attended the March 23, 2010 Enfield School Board meeting.  The minutes of that meeting reflect that Wolfgang informed the attendees that the ACLJ would fund any legal defense required.  Exh. 40 at 4; Tr. at 174.  Wolfgang urged the Board to return to First Cathedral and to "[s]tand up for religious rights" and "for the constitution and our first amendment rights" by holding graduations at First Cathedral.  Exh. 40 at 4.  Another attendee stated that he would like to fight the ACLU

because "[a]ll countries have their beliefs and we should not run away from it or be embarrassed about our religious values." Exh. 40 at 3. Speaking at the same March 23, 2010 meeting, Chairman Stokes stated that the graduation decision was not an easy one, and that "[m]orally, ethically and spiritually each Board member will get their vote." Id. at 8.

The Enfield Schools' budget for the 2010 graduations is $32,000, of which $15,000 has been allocated for Enfield High's graduation, and $17,000 has been allocated for Fermi High's graduation. First Cathedral's rental fees for holding both of the high schools' graduations on two separate days will be $8500 per high school. In previous years, however, First Cathedral charged additional fees. Stip. ¶ 33. In 2009, for example, First Cathedral set a rental fee of $8200 per high school. Exh. 51. Ultimately, however, each school was charged $9200, apparently because of the rental cost of a ramp that enabled handicapped access.[12] See Exh. 141 at 5. Nothing in the record indicates that there would be any difference between 2010 and 2009 with respect to these extra fees.

Numerous alternative venues were proposed to the School Board prior to the final vote to hold graduation ceremonies at First Cathedral. An assessment of alternative locations was undertaken by the principals of the two high schools, Thomas Duffy and Paul Newton; compiled by John Gallacher, Superintendent of Enfield Public Schools; and presented first at the March 23 Board meeting and again at the April 13, 2010 meeting. See Exhs. E, 52. First Cathedral was not included in this written

---

[12] First Cathedral also charged Enfield Public Schools an additional $1160 for receptions held during each day's ceremonies. See Exh. 146.

assessment.  Among the off-site venues that were included in the assessment were Western New England College, Springfield Symphony Hall, the Mass Mutual Center, the Bushnell Theater, XL Center, and the Connecticut Convention Center.  Exh. 53. Although the Board did not establish written criteria for evaluating these locations, the officials performing the assessment considered numerous factors, including: availability; costs associated with the use of each facility including rental, parking, security, sound system, set up, clean up; seating capacity; audio-visual capability; restroom availability; handicap accessibility; catering availability; staging area for the graduates; and reception area availability.  Id.  Additionally, it was important that the two high schools' graduations be held on separate days because the graduations traditionally took place on different days.[13]

Some of the alternative sites compare favorably to the Cathedral in terms of the factors set forth above.  Without exhaustively cataloguing the entirety of alternative venues considered, a brief review of a couple of the available alternatives is worthwhile. The Springfield Symphony Hall could host both graduations, on the two scheduled dates, at a lower cost ($11,400).  See Exh. 52 at 3.  This facility seats approximately 2611 guests, is handicapped accessible, and has a staging area.  Id. at 3, 5.  It was estimated by the Enfield Board that the seating capacity would require Enfield to limit each graduate to eight (8) tickets each, but it was felt that this "should not be a huge issue."  Exh. 52 at 3.  Symphony Hall charges a $3 per car parking fee, and lacks

---

[13] Graduates attend an evening entertainment event after graduation called SafeGrad.  Because SafeGrad cannot accommodate the graduates of both high schools on the same night, holding the two graduation ceremonies on separate days was important.

reception and catering availability.  Chairman Stokes testified that Symphony Hall was "suitable" for the Enfield graduations, and its price was "right."  Tr. at 66, 122.

The Mass Mutual Center, which accommodates 6600 guests, was quoted at $24,600 if the graduations were held on two separate days.  See Exh. 141 at 2.  This price includes handicap accessibility, staging and reception areas, set up costs, and security.  Id.  However, Newton believed the facility was willing to further negotiate price.  See Exh. 141 at 2.  The site is a 12-minute drive from Enfield High and 17-minute drive from Fermi High; there is also a $7 per car parking fee at this location.  Exh. E-5.

In addition to these "off-site" venue options, Enfield also evaluated the possibility of holding the graduation ceremony at each respective high school, as originally favored by the Board in January 2010.  This alternative was apparently determined not to be feasible due to the fact that each school's football field has an artificial turf surface; holding graduation ceremonies on the turf without a protective covering would void the turf's warranty.  Taking into account the rental of the protective cover for two days, the cost of conducting graduation on the artificial turf, with an inside location in case of inclement weather, is approximately $29,035. This price includes chair rentals, see Exh. 52 at 7, but the Town Manager stated that the Town owns approximately 2400 mismatched folding chairs which could be used at graduation, thereby reducing some cost.  See Exh. 141 at 24.

Upon learning of these alternatives, some Board Members concluded that First Cathedral provided the best location within the budget.  Other members expressed apprehension that, when coupled with the costs of defending the School Board in a

potential lawsuit, holding graduations at First Cathedral would actually be more costly.

See Exh. 41 at 6-7.  Although costs would be severely defrayed on account of the fact

that the ACLJ would provide pro bono counsel for Enfield, filing fees and other

associated costs were estimated at roughly seven or eight thousand dollars.  Id.

On April 13, 2010, the Board voted six (6) to three (3) to hold the 2010

graduations at First Cathedral.

E.    Modification Plans

On May 25, 2010, the Enfield Board of Education passed the following Motion:

MOTION TO AFFIRM THE ENFIELD BOARD OF EDUCATION'S
INTENTION REGARDING MODIFICATION OF THE INTERIOR
OF FIRST CATHEDRAL FOR THE 2010 GRADUATION OF
ENFIELD HIGH SCHOOL AND ENRICO FERMI HIGH
SCHOOL -- WITH THE UNDERSTANDING THE
MODIFICATIONS WILL BE AS FOLLOWS:

1.  The banners in the lobby will be masked or removed.
2.  The Visitors table with the banner in front will be removed.
3.  The bookstore/ gift shop will be closed, and items will be removed from the exterior windows.
4.  The fountain in the lobby will be turned off and covered.
5.  Areas of the upper and lower hallways that do not need to be accessed in order to enter the auditorium, enter the staging room, enter the reception room, or use a restroom will be roped off from access by graduation attendees.
6.  All framed art in the lobby; the upper and lower hallway areas that are not roped off; the staging area; and the reception area; which contain a religious image or message will be covered.
7.  The word "sanctuary" will be covered at the entrance to the auditorium.
8.  The banners in the auditorium will be masked or removed.
9.  The light behind the stained glass at the rear of the stage will remain off, as will the recessed lighting in the area of the baptistery.
10.  The communion table will be removed from the auditorium.
11.  The images in the carpet in front of the stage will be covered.
12.  The image of a dove at the podium will be covered.
13.  The numerous flat screen televisions throughout the

> auditorium will only show the graduation events, and will have no
> image regarding First Cathedral.
> 14.  All First Cathedral flyers, brochures, hymnals, Bibles,
> donation envelopes, and informational papers of any kind will be
> removed from any area accessible to graduation attendees.
> 15.  No First Cathedral staff will serve as greeters to the
> graduation attendees, or will interact in any way with the
> attendees, other than as necessary to provide the services
> contracted for by the Enfield BOE.
> 16.  Any religious image or message not specifically described
> above will be masked or removed if disclosed, the only exceptions
> being the cross at the top of the structure, and what has been
> represented to be a cross in the stained glass formed by the steel
> window mullions above the front entranceway.

May 25, 2010 Affidavit of Gregory Stokes (Exh. L).[14]  Although not part of the record

evidence, counsel for Enfield Schools represented that it would decide what was a

"religious image or message."  Either Enfield Schools, or First Cathedral staff directed

by Enfield Schools, would remove such items.[15]  Any cost associated with such removal

or coverage will be borne by First Cathedral.[16]

## III.  DISCUSSION

### A.  Preliminary Injunctive Relief Standard

Interim injunctive relief "is an extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of

---

[14] Chairman Stokes' testimony at the hearing raises questions as to what specific agreement Enfield Public Schools had with First Cathedral with regard to any modifications for the 2010 graduations. See Transcript of Hearing Re: Preliminary Injunction ("Tr.") (stating with certainty only that there was an agreement to cover or remove the banners in the First Cathedral lobby and sanctuary, and the seven images present within the First Cathedral carpet).

[15] The Cathedral has previously represented to the Schools that it would be difficult to cover the religious banners hanging in the sanctuary.  Exh. 145.

[16] Enfield's counsel represented at Oral Argument that First Cathedral "will not charge" for the modifications.  Enfield's proposed findings of fact, however, state that the "costs associated with these modifications are de minimis and will be borne by the schools."  Defendant's Proposed Findings of Fact (Doc. No. 85) at ¶ 82.

persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis, internal quotation marks and citation omitted). "A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 152-53 (2d Cir. 2007).

If a party seeks a mandatory injunction, i.e., an injunction that alters the status quo by commanding the defendant to perform a positive act, he must meet a higher standard. "[I]n addition to demonstrating irreparable harm, '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, . . . a standard especially appropriate when a preliminary injunction is sought against government." D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006) (citations omitted). Such a heightened standard is also applicable where "the issuance of an injunction will render a trial on the merits . . . partly meaningless, either because of temporal concerns . . . or because of the nature of the litigation, say, a case involving the disclosure of confidential information." Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 35 (2d Cir. 1995) (citing Abdul Wali v. Coughlin, 754 F.2d 1015, 1026 (2d Cir. 1985), overruled on other grounds, O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 n.2 (1987)).

In this case, the Does seek a preliminary injunction that will both alter the status quo by requiring Enfield Public Schools to perform a positive act (namely, moving the scheduled high school graduations to another location) and render a trial on the merits

largely meaningless "because of temporal concerns." Tom Doherty Associates, Inc., 60

F.3d at 35.  Therefore, the Does must meet the higher standard of a clear or substantial

showing of a likelihood of success on the merits.

The Does have demonstrated a likelihood of irreparable harm if the preliminary

injunction is not issued.  Violations of First Amendment rights are "commonly

considered irreparable injuries for the purposes of a preliminary injunction." Bery v. City

of New York, 97 F.3d 689, 693 (2d Cir. 1996) (citing Elrod v. Burns, 427 U.S. 347, 373

(1976) ("[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury")); 11A CHARLES A. WRIGHT, ARTHUR R.

MILLER AND MARY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.1 at 161 (2d ed.

1995) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts

hold that no further showing of irreparable injury is necessary").  Therefore, the critical

question is whether the Does have made a clear or substantial showing of a likelihood

of success on the merits as to their First Amendment claims or their claims under

Article Seventh of the Connecticut Constitution.

B.    First Amendment Claim

The First Amendment to the United States Constitution provides that "Congress

shall make no law respecting an establishment of religion, or prohibiting the free

exercise thereof . . . . " U.S. CONST. amend. I.[17]  However, the "First Amendment

contains no textual definition of 'establishment' and the term is certainly not

---

[17] These requirements extend to state and local governments through the Fourteenth
Amendment.  See U.S. CONST. amend. XIV; Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

self-defining."  McCreary County, Ky. v. ACLU of Ky., 545 U.S. 844, 874-75 (2005).

"Neutrality" has served as a useful touchstone in navigating the interpretive problems

that the Establishment Clause creates.  Id.  As the Supreme Court has observed, "the

principle of neutrality has provided a good sense of direction: the government may not

favor one religion over another, or religion over irreligion, religious choice being the

prerogative of individuals under the Free Exercise Clause."  Id. at 875-76.  Nonetheless,

"[w]here the Establishment Clause is at issue, tests designed to measure 'neutrality'

alone are insufficient."  Van Orden v. Perry, 545 U.S. 677, 699 (2005) (Breyer, J.,

concurring);  see also Lee v. Weisman, 505 U.S. 577, 627 (1992) (Souter, J.,

concurring) ("That government must remain neutral in matters of religion does not

foreclose it from ever taking religion into account.").  Therefore, the Supreme Court has

established several tests that guide this court's analysis.

 The essential framework for assessing Establishment Clause claims is provided

by the three-prong test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971).  "Under

[the] Lemon [test], government action that interacts with religion must: (1) have a

secular purpose, (2) have a principal effect that neither advances nor inhibits religion,

and (3) not bring about an excessive government entanglement with religion."

Westchester Day School v. Vill. of Mamaroneck, 504 F.3d 338, 355 (2d Cir. 2007)

(citing Lemon, 403 U.S. at 612-13).  With regard to the second prong (effect), which is

the focus of this decision, the Lemon test essentially asks whether "the practice under

review in fact conveys a message of endorsement or disapproval."  Lynch v. Donnelly,

465 U.S. 668, 690 (1984) (O'Connor, J., concurring); see also County of Allegheny v.

ACLU, 492 U.S. 573, 592-94 (1989); Skoros v. City of New York, 437 F.3d 1, 17 (2d

Cir. 2006).[18]

Although the Lemon test continues to guide Establishment Clause cases, the Supreme Court has refined its analysis.  The Court has embraced a variety of approaches that can be viewed as either components of Lemon or supplements to it. First, in light of the fact that "the factors [used] to assess whether an entanglement is 'excessive' are similar to the factors [used] to examine 'effect,'" the Supreme Court has determined that "it is simplest to recognize why entanglement is significant and treat it . . . as an aspect of the inquiry into a statute's effect."  Agostini v. Felton, 521 U.S. 203, 232 (1997); see also Skoros, 437 F.3d at 17 (analyzing "entanglement" as a separate prong from a statute's "effect" but being "careful to observe the link drawn in [Agostini] between this third prong of Lemon analysis and the second 'effect' prong."). In this case, the court will incorporate the analysis of whether holding Enfield's high school graduations at First Cathedral creates an "excessive entanglement" with religion into the second prong of the Lemon test.

Second, the Supreme Court has recognized that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise" because the "design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed

---

[18] It bears noting that there has been criticism of the Lemon test at various points in its nearly forty-year history.  See, e.g., Lamb's Chapel v. Ctr. Moriches Union Free School District, 508 U.S. 384, 398 (1993) (Scalia, J., concurring) ("Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, Lemon stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys . . . ."); Van Orden v. Perry, 545 U.S. 677, 697 (2005) (Thomas, J., concurring).  Nonetheless, the Second Circuit has recently reaffirmed that "the Lemon test continues to govern our analysis of Establishment Clause claims."  Skoros v. City of New York, 437 F.3d 1, 16 n.3 (2d Cir. 2006).

to the private sphere." <u>Lee</u>, 505 U.S. at 589.  Some courts have regarded the

"coercion" test as one component of the second prong of the <u>Lemon</u> test.  <u>See, e.g.</u>,

<u>DeStefano v. Emergency Housing Group, Inc.</u>, 247 F.3d 397, 412 (2d Cir. 2001).  Other

courts, however, have viewed the "coercion" test as established in <u>Lee v. Weisman</u> to

require analysis separate and apart from the <u>Lemon</u> factors.  <u>See, e.g.</u>, <u>Modrovich v.</u>

<u>Allegheny County</u>, 385 F.3d 397, 400 (3d Cir. 2004) (explaining that the Supreme Court

has articulated "three separate tests for determining whether governmental action

violates the Establishment Clause" and viewing the coercion test as particularly

applicable to government action in the context of public education).  Both because it

seems a more focused approach, and because it appears to be in accordance with the

Second Circuit's view, the court will address "coercion" as one indication of effect, i.e.,

under prong two of the <u>Lemon</u> test, and not as an entirely separate inquiry.  However,

whether or not the coercion test is regarded as a modification of or supplement to the

<u>Lemon</u> test, it remains indisputable that "at the heart of Establishment Clause doctrine

lies the principle that 'government may not coerce anyone to support or participate in

religion or its exercise.'"  <u>DeStefano</u>, 247 F.3d 397 at 411 (citing <u>Lee</u>, 505 U.S. at 577).

While these analytical frameworks assist courts in evaluating Establishment

Clause claims, this court, and the parties, recognize that, "[i]n each case, the inquiry

calls for line drawing; no fixed, per se rule can be framed," as "[t]he purpose of the

Establishment Clause 'was to state an objective, not to write a statute.'" <u>Lynch</u>, 465

U.S. at 678 (quoting <u>Walz v. Tax Commission of City of New York</u>, 397 U.S. 664, 668

(1970)).  Indeed, the Establishment Clause creates a "blurred, indistinct, and variable

barrier depending on <u>all the circumstances</u> of a particular relationship."  <u>Lemon</u>, 403

-22-

U.S., at 614 (emphasis added).  With these observations regarding the current state of

the Supreme Court's Establishment Clause jurisprudence in mind, the court now

proceeds to evaluate the constitutionality of the Enfield School Board's decision to hold

2010 high school graduations at First Cathedral.

        1.    Purpose

     "When government action interacts with religion, Lemon instructs that the

government purpose must be 'secular.'"  Skoros, 437 F.3d at 18 (citing Lemon, 403

U.S. at 612).  The Supreme Court "has invalidated legislation or governmental action on

the ground that a secular purpose was lacking, but only when it has concluded there

was no question that the statute or activity was motivated wholly by religious

considerations."  Lynch, 465 U.S. at 680 (citing cases); see also McCreary County, Ky.,

545 U.S. at 862 (observing that government action has been held unconstitutional

under this prong of analysis "only because openly available data supported a

commonsense conclusion that a religious objective permeated the government's

action.").  "Although a legislature's stated reasons will generally get deference, the

secular purpose required has to be genuine, not a sham, and not merely secondary to a

religious objective."  McCreary, 545 U.S. at 864.

     In light of the evidence on the record at this stage of the case, plaintiffs concede,

and the court agrees, that they have not met their burden of showing "a clear or

substantial showing of a likelihood of success" that "there [is] no question that the . . .

[challenged] activity was motivated wholly by religious considerations."  D.D. ex rel.

V.D., 465 F.3d at 510; Lynch, 465 U.S. at 680.  Plaintiffs have therefore not carried their

burden for obtaining a preliminary injunction with respect to the purpose prong of the

Lemon analysis.

2.      Primary Effect

"The second prong of the Lemon test mandates that the 'principal or primary

effect' of the challenged government action 'must neither advance nor inhibit religion.'"

Skoros, 437 F.3d at 29 (quoting Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294

F.3d 415, 430 (2d Cir. 2002)).  Depending on context, courts have applied a variety of

more particular analytical frameworks in evaluating a particular government action's

"effect" for Establishment Clause purposes.  Specifically, "endorsement," "coercion,"

and "entanglement" each play a role in determining if a governmental program has run

afoul of prong two of the Lemon test.  See County of Allegheny, 492 U.S. at 592-94

(analyzing prong two of Lemon by addressing endorsement); Agostini, 521 U.S. at 232

(entanglement); Altman v. Bedford Cent. School Dist., 245 F.3d 49, 75 (2d Cir. 2001)

(coercion).

a.      Endorsement

"The concept of endorsement is not limited to government coercion or efforts at

proselytization; it is intended to take account of 'the numerous more subtle ways that

government can show favoritism to particular beliefs or convey a message of

disapproval to others.'"[19]  Skoros, 437 F.3d at 29 (quoting Allegheny, 492 U.S. at

_____

[19] While some courts have declined to apply the endorsement test in certain circumstances, see, e.g., DeStefano, 247 F.3d 397 at 411 (declining to apply endorsement analysis to a taxpayer's challenge to state funding of an alcohol treatment facility), this court concludes, and Enfield Public Schools agrees, that the test is particularly apposite to the issue of whether holding Enfield's graduations at First Cathedral violates the Establishment Clause.  See Transcript of Oral Argument ("Tr. of Oral Arg.") at 46 (Enfield Public Schools urging that the endorsement test is the appropriate "measuring stick" in this case).  As the DeStefano court made clear, "the endorsement inquiry remains a viable test of constitutionality in certain unique and discrete circumstances – for example, where the government embraces a religious symbol or allows the prominent display of religious imagery on public property."  Id. at 411 (citing County of

-24-

627-28, (O'Connor, J., concurring)).  The endorsement test "seeks to ensure that government does not make a person's religious beliefs relevant to his or her standing in the political community . . . thereby sending a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."  Id. (internal quotation marks and citations omitted). "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion."  Lynch, 465 U.S. at 694 (O'Connor, J., concurring).

     i. Reasonable Observer.  A court evaluating whether or not a particular policy runs afoul of the endorsement test "considers whether a reasonable observer . . . aware of the history and context of the community and forum in which the religious display appears, would understand it to endorse religion or . . . one religion over another." Skoros, 437 F.3d at 30 (citations omitted).  A reasonable observer is not a particular individual, but is instead "a personification of a community ideal of reasonable behavior."[20]  Id. (quoting Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995)).

---

Allegheny, 492 U.S. at 595; Lynch, 465 U.S. at 688-94).  Plaintiffs allege such a circumstance – that government has embraced the religious symbol that is First Cathedral, as well as those contained on and in it.  See Mot. for Preliminary Injunction. In addressing how broadly the endorsement test should apply to First Amendment claims, the Supreme Court has noted that "'[e]ndorsement' connotes an expression or demonstration of approval or support" and that previous cases have "accordingly equated 'endorsement' with 'promotion' or 'favoritism.'" Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 763-64 (1995) (citing, inter alia, The New Shorter Oxford English Dictionary 818 (1993); Webster's New Dictionary 845 (2d ed. 1950)).  The question of whether holding graduations at First Cathedral "promotes" or "favors" religion lies at the heart of plaintiffs' Complaint, and the application of the endorsement test to the circumstances of this case is therefore appropriate.

    [20] Clearly, neither Archbishop Bailey nor Professor Kirkpatrick are the "reasonable observer" given their expertise and experience.  The parties and the court agree that the Does are not the "reasonable observer" in this case, either.

Because this case involves the application of endorsement analysis within the public school context, a preliminary issue arises as to the identity of the reasonable observer.  In the court's view, the significance of this issue is lessened by the fact that the government action affects mainly high school seniors of a similar age and their adult family members.  Cf. Santa Fe Independent School District v. Doe, 530 U.S. 290, 302 (2000) (evaluating endorsement by reference to an "objective Santa Fe High School student").  However, to the extent that there is a "range" of those to whom the challenged actions apply, the court disagrees with plaintiffs' suggestion that it should evaluate the challenged activity through the lens of multiple, objective observers.  See Skoros, 437 F.3d at 24 ("Nor does Supreme Court precedent appear to contemplate multiple reasonable objective observers, for example, persons who believe in God as distinct from those who do not . . . .").  Rather, this court follows the Second Circuit's guidance that "the relevant objective observer . . . is an adult who is aware of the history and context of the community and forum in which the religious display appears . . . and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the 'law of imitation.'"  Id. (internal quotation marks and citations omitted).

Upon consideration of the evidence from the perspective of such a reasonable observer, the court concludes that plaintiffs have made a substantial showing that they are likely to succeed on the merits of their claim that holding 2010 graduations at First Cathedral constitutes an impermissible endorsement of religion because it conveys the message that certain religious views are embraced by Enfield Schools, and others are not.  The court bases its conclusion on both the character of the forum selected for the

-26-

graduations and the history and context of Enfield Schools' decision.

ii. Character of Forum.  Based upon the experience of attending the 2010 graduation ceremonies at First Cathedral, a reasonable observer would conclude that Enfield Public Schools endorses religion, specifically the Christian faith.  The strong impressions that were created during the court's visit to First Cathedral provide support for that view.  While the entirety of the description of First Cathedral provided supra, at 4-8, need not be repeated, some attributes of the facility deserve noting here, as they would be viewed by a reasonable observer.

As defendant's counsel acknowledged at Oral Argument, attendees from Enfield would approach First Cathedral from the intersection of Blue Hills Avenue and Wintonbury Avenue, where there is a large sign that states "FIRST CATHEDRAL." From this vantage point, the enormous cross on the top of the building's roof, planted above a cupola with stained glass panels, is plainly visible.  This is only the first of several encounters graduates and graduation attendees will have with this overtly religious symbol.  After parking, students and guests will walk around the Cathedral to approach the entrance.  They will then enter the facility, through that main entrance, over which there is a large cross within the window that is immediately discernible. They will pass through the main lobby, from which that same cross is visible.  Enfield Schools does not contest that these crosses are visible to all attendees.  Finally, upon entering the sanctuary, another large cross is readily identifiable behind the stage.[21]

---

[21]  The court observed this large cross under the same lighting conditions as those planned for the graduation ceremonies.  It is ineluctably clear that this cross is visible, and noticeable, from all areas of the auditorium, even under those circumstances.

The defendant does not contest that this cross will be in full view to the audience members throughout the ceremony, and to the graduates as they enter and later as they collect their diplomas.

A reasonable observer would perceive other religious objects, symbols, and messages besides these crosses.  Surrounding the main entrance's central cross is a stained glass window panel depicting people worshiping, with their hands in the air directed at light shining down from above.  Numerous prints line the lobby and halls of the Cathedral, the majority of which either depict scenes from the Bible, contain religious imagery, or bear placards quoting biblical passages.  One such print quotes the Lord's Prayer.  Contrary to Archbishop Bailey's claims, a reasonable observer would not perceive these prints to be merely "eclectic;" instead, the reasonable observer would certainly discern their plainly religious meaning in the setting of a church.  The carpet of the sanctuary contains images which include such Christian symbols as a chalice, a lamb, a shepherd's hand and staff, and a lion.  When viewed within a structure, with crosses, named "First Cathedral," the reasonable observer would quickly understand the images to bear religious significance.

To be sure, the Enfield School Board has expressed an intention to reduce the number of religious symbols that will confront attendees of the 2010 graduations.  See Exh. L (stating School Board's commitment to making certain modifications to the Cathedral for the 2010 ceremonies and listing those modifications).  The court does not doubt that the School Board's commitment is sincere.  Nonetheless, the failure of previous efforts by the School Board to modify the Cathedral's religious symbols casts some doubt over the likelihood that the Board will be successful this year.  See supra,

at 8.  In 2007, John Gallacher, Superintendent for the Enfield Schools, wrote to First Cathedral on behalf of the schools and two other districts, asking that the banners behind the stage be removed during graduations.  See Exh. 145.  Despite the request, the banners remained in place for all Enfield graduation ceremonies that have occurred at First Cathedral.  See Exhs. 5, 118-121.  Further, Enfield's communications with the staff of First Cathedral regarding this year's graduations prior to the Board's resolution of May 25 had not yielded concrete agreement as to which items would be covered.[22] Moreover, to the extent that Archbishop Bailey ultimately selects which items require covering, the record indicates that his views as to what objects contain religious meaning do not map onto the views of a reasonable observer.  As a result, items with a plainly religious meaning would be left visible.  See generally Bailey Dep. (claiming, inter alia, that image of chalice is not religious but instead represents "community;" that other images in carpet, including the lamb, lion, shepherd's staff, fish, and fire are likewise non-religious; that majority of art in hallways is eclectic, but does not contain a religious meaning).

Setting aside these practical questions that loom over the Board's resolution to

---

[22] See Bailey Dep. at 23 (Q: "Have you agreed further to make other changes to the cathedral if necessary or required in order to remove any other religious paintings or images?" A: "I don't know if I have been asked that"); Stokes, Tr. at 67 (Q: ". . . you asked Bishop Bailey to cover the banners, signs, pictures in the lobby, and the carpet?" A: "We talked in generality.").  At times Archbishop Bailey has indicated that he would be willing to cover anything that could feasibly be covered that the Board identified. See Bailey Dep. at 26 (Q: "If you were asked to make further changes that didn't require structural changes to the First Cathedral facility, would you be willing to make  – " A: "I am sure I would have no problem").  At other times, however, Archbishop Bailey's position on covering items has been less clear. See id. at 23 (Q: "[I]f you were asked and somebody found a picture of Jesus Christ somewhere in the hallway, would you have a problem with having it covered for the purpose of the graduation?" A: "Perhaps" Q: "And now, is your answer, perhaps, because there is certain images that can't be changed or removed or covered?" A: "I don't know.  Around the building we have considerable art.  And most of it is not religious at all, it is eclectic.").

cover some religious items within First Cathedral, the fact remains that, even if every modification identified in the May 25, 2010 resolution is implemented, those attending the graduation ceremonies at First Cathedral will still encounter: (1) the large cross on the Cathedral's roof; (2) the large central cross at the Cathedral's main entrance; (3) the stained glass depiction of worshipers in the Cathedral's main entrance; (4) the large cross behind the stage that undoubtedly constitutes the focal point of the entire sanctuary.  A reasonable observer attending the 2010 graduations would have no choice but to conclude that the message displayed on the jumbo-screens during the 2009 graduation ceremonies was exactly accurate: "This is God's house where Jesus Christ is Lord."  Exh. 2-5.  That message will continue to be transmitted, and received, even if the jumbo-screens will no longer display it at the 2010 ceremonies.

In this way, even if each of the alterations to the Cathedral identified in the May 25, 2010 Enfield Board of Education Motion are made in advance of the 2010 graduations, First Cathedral remains a far more "religious" environment than the vast majority of other publicly-leased religious spaces that have been the subject of Establishment Clause claims.  Enfield Schools urges that this case is like Porta v. Klagholz, 19 F. Supp. 2d 290 (D.N.J. 1998), in which the court declined to find that a lease arrangement permitting the operation of a school on church property constituted an Establishment Clause violation.  However, in Porta, "[t]here [were] no visible church signs or religious symbols, artwork, or literature within any classroom."  Id. at 299 (emphasis added).  Here, such is not the case.  In addition, the Porta students came through a separate entrance signed as the school.  Id.  That is not the case here, either. Further, the challenged building in Porta had a "secular appearance, being quite

-30-

rectangular with a straight roofline."  Id.  The exterior of First Cathedral, by contrast, is an unusual, essentially round shape, and dominated by an enormous cross.[23]

First Cathedral more closely resembles the space that was the subject of a constitutional challenge in Spacco v. Bridgewater School Dep't, 722 F. Supp. 834, 842-43 (D. Mass. 1989), in which the district court held that students assigned to a public school facility leased from the Roman Catholic Church were entitled to a preliminary injunction requiring reassignment because of the religious character of the leased space.  The Spacco court observed that, "in order to enter the building, the children and other individuals pass beneath a large cross beside the name St. Thomas Aquinas Parish Center."  Spacco, 722 F. Supp. at 842.  The court concluded that there existed an Establishment Clause violation, even though by "[s]imply sitting in a classroom, a reasonable observer, including a reasonable child, would not receive any constitutionally impermissible message from his or her surroundings."  Id.

First Cathedral creates an environment even more overwrought with religious symbols than the venue challenged in Spacco.  Similar to the Spacco students, in order to attend the 2010 graduations, the attendees will observe the large cross on the roof, would observe a sign that bears the name "First Cathedral," and would have to pass beneath a large cross that is plainly visible above the main entrance.  However, unlike the Spacco students (who sat in classrooms free from religious messages), attendees of the 2010 graduations would sit in a sanctuary focused on a large cross.

---

[23] Porta is also distinguished by the fact that, in that case, the "school's location in the church was by process of elimination, since the site was chosen as the only possible facility after an extensive search in a limited urban real estate market."  As discussed infra, at 33-35, alternative secular sites have been and remain available to Enfield Schools.

Upon attending graduation ceremonies, a reasonable observer would conclude that the Board's April 13, 2010 decision to use First Cathedral sends the message that the Board embraces the religious values, symbols, and ideas present within First Cathedral.[24]  Cf. Spacco, 722 F Supp. at 842 (relying on the religious symbols present within St. Thomas Aquinas Parish Center to conclude that the use of that center "conveys a number of related, impermissible messages," including that "the public school and the Roman Catholic Church are closely linked" and that "Roman Catholic people are preferred").  The endorsement test "is intended to take account of 'the numerous[,] more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others.'" Skoros, 437 F.3d at 29 (citations omitted).  By choosing to hold graduations at First Cathedral, Enfield Schools sends the message that it is closely linked with First Cathedral and its religious mission, that it favors the religious over the irreligious, and that it prefers Christians over those that subscribe to other faiths, or no faith at all.

    iii.  <u>Context and History.</u>  In addition to the character of the forum, the history and context of the decision to hold the graduations at First Cathedral also support the

---

[24] The court recognizes that Enfield Public Schools plans to place a disclaimer on the graduation programs similar to the disclaimer used at past Enfield High graduations.  <u>See supra,</u> at 9-10.  As defendant acknowledges, although the disclaimer informs a reasonable observer's impressions, it would not cure the constitutional violations that this Ruling finds.  <u>See Cooper v. United States Postal Service</u>, 577 F.3d 479, 495-96 (2d Cir. 2009); Tr. of Oral Arg. at 77 (counsel for Enfield Public Schools stating that "we do not take the position in the case, nor could we, that the reading of the disclaimer solves the [Establishment Clause concerns].  Courts have never ruled that way.").  The court notes that the Supreme Court viewed that a large sign disclaiming government endorsement of a Klan cross would have "help[ed] remove doubt about state approval of respondents' religious message." <u>See Capitol Square Review and Advisory Bd.</u>, 515 U.S. at 776.  However, the proposed disclaimer in <u>Capitol Square</u> was "legible from a distance," where as the disclaimer Enfield Public Schools plans to use is not.  <u>Id.</u> at 792.  Furthermore, in <u>Capitol Square</u>, placing a disclaimer in front of the challenged cross would virtually guarantee that anyone perceiving the message of the cross would also read the disclaimer.  By contrast, placing a small disclaimer on a graduation program does not have the same likelihood of reaching the viewer.

conclusion that, in doing so, Enfield Public Schools has endorsed religion.  The context of a challenged government action is relevant and useful to endorsement analysis. Zelman v. Simmons-Harris, 536 U.S. 639, 655 (2002) ("the reasonable observer in the endorsement inquiry must be deemed aware of the history and context underlying a challenged program") (internal quotation marks and citations omitted).  Therefore, a reasonable observer will be presumed to know a variety of contextual facts surrounding the April 13, 2010 Board decision, including the Board's consideration of alternatives, the substance of Board deliberations at meetings leading up to the vote, statements by the Board, and FIC's statements and lobbying efforts.

The Board's evaluation of alternative venues in March and April 2010 does not appear to be an open-minded consideration of legitimate available alternatives.[25]  First Cathedral was never included in the written comparisons offered at either the March 23 or April 13, 2010 Board meetings, and the minutes of those meetings reflect no discussion as to First Cathedral's actual price or amenities.[26]  Furthermore, the Board was aware that several locations offered similar accommodations for graduation ceremonies at a price less than the $32,000 budget.  The rental fee for Symphony Hall, for example, totals $11,400 for both schools – a figure that is at least $5000 less than

---

[25] The court does not here seek to review whether the actual purpose of the Board was religious or secular, as plaintiffs have wisely not pressed that argument at this stage.  See supra, at 23-24.  Rather, the court notes the existence of deliberations surrounding alternative venues only to highlight that a reasonable observer would be aware that other graduations sites existed, were used by other schools, and were rejected by the Board.  Nor by focusing exclusively on Symphony Hall does the court mean to imply that this was the only plausible alternative location; the record indicates that the Board was aware of several venues that were suitable, and the reasonable observer would be aware of this fact as well.

[26] While it might be thought that the Board knew of the First Cathedral details from prior graduations, four of its nine members were newly elected in November 2009.

the rental fee charged by First Cathedral.[27]  See Exh. 52 at 3.  Although the facility seats 2611 graduates and spectators would likely require Enfield Schools to limit each graduate to eight (8) tickets each, it was deemed "that should not be a huge issue."[28] Id.

Chairman Stokes noted that there were other ways in which Symphony Hall did not match First Cathedral in meeting particular criteria that the Board was looking for, but the Board never generated a concrete list of the precise criteria that needed to be met.  Indeed, certain requirements that Chairman Stokes claims the Board believed a venue had to satisfy seem designed to eliminate First Cathedral's competitors.  During the May 24, 2010 hearing, for example, the court asked Stokes, "What size is a minimum size that you think makes a facility acceptable?"  Tr. at 215.  Chairman Stokes replied, "I think that being able to have unlimited seating where anybody can come in and celebrate with their families is probably where I have leaned to."  Id.  When the court inquired further and asked what constitutes "unlimited seating," Stokes replied, "In this case here it is about 3000 seats."  Id.  First Cathedral's seating capacity is 3000. Exh. 50 at 1.[29]

The court acknowledges that Symphony Hall does not match all that First Cathedral has to offer.  Nonetheless, the record also reflects that, even accounting for

---

[27]  When, at the March 23, 2010 Board Meeting, Chairman Stokes inquired as to whether Newton could guarantee this and other prices, the minutes record that "Newton is confident."  Exh. 40 at 13.

[28]  The court estimates that, for Fermi High School, the larger of the two graduating classes, each senior received approximately nine or ten seats for their guests.

[29]  Chairman Stokes testified that there was "standing room only" at Fermi High's 2009 graduation. In viewing the video, this court observed a few persons standing in the back, apparently by choice, as there were a significant number of empty seats.  Exh. 121.

the disparities, Symphony Hall was "priced right," and was "suitable" if not preferable. Tr. at 66, 122.  In terms of the critical budget concerns, Symphony Hall was substantially less expensive.  Knowing that many other schools use Symphony Hall for graduation, Exh. 28 at 5, the reasonable observer would also note that, in an economic climate that will likely cause Enfield to close one high school and up to three elementary schools, any minor disparities with respect to offered amenities should not have been enough to outweigh the savings offered by Symphony Hall.[30]

The reasonable observer is also aware that, between the February 23 and March 23 Board meetings, the decision process took place in the context of an intensified lobbying effort by the FIC of the Enfield School Board to move the high school graduations to First Cathedral for the sake of "religious liberty."  On March 9, 2010, FIC's Executive Director, Peter Wolfgang, sent out an electronic action alert to its approximately 6000 members entitled, "In Enfield, A Call to Arms!"  See Exh. 93.  The alert implies that the ACLU was focused on the Enfield case because First Cathedral's pastor (Archbishop Bailey) was "one of the most visible Protestant clergymen to oppose same-sex 'marriage' in our state."  Exh. 93.  The message states that the American Center for Law and Justice (ACLJ) had offered to represent the Enfield Public Schools in any legal action that might result from the decision to hold graduations at First Cathedral, and urges members to lobby Board Members in advance of the March 23, 2010 Board Meeting because "[t]his is our only opportunity to ensure that religious

---

[30] While Enfield Public Schools notes it has budgeted money sufficient to pay for graduation at First Cathedral's price, it relies on a crushing deficit situation to justify excluding other sites that may have been more expensive.  Given a $500,000 deficit in its current budget, year ending 6/10, the fact is it does not "have" the money to pay for any graduation.  It must cut costs somewhere in this fiscal year to close its budget gap.

liberty is not trampled by default!"[31] Id. at 3.

After a series of exchanges that confirmed that the ACLJ had in fact agreed to represent Enfield Public Schools, Wolfgang and Stokes agreed to "be on the same page."  Exh. 151.  Wolfgang also informed a lawyer from the ACLJ that Chairman Stokes had declared that, if the ACLJ publicly states it will defend Enfield pro bono, "[Stokes] can produce the votes to return graduation to First Cathedral."  Exh. 151. Lobbying efforts continued at the March 23, 2010 Board meeting, where Wolfgang personally implored Board members to "[s]tand up for religious rights."  Exh. 40 at 4. Graduations plans were still undetermined following the March 2010 Board Meeting, and FIC pressed on.  Its efforts included "pumping" Chairman Stokes for information regarding the status of Board members, lobbying for Board members' votes, and strategizing with Chairman Stokes as to how to achieve the necessary five votes to move the graduations to First Cathedral.  See Exhs. 152, 153, 157.  The record indicates that these efforts were successful, and that, but for FIC and Wolfgang, Enfield Public Schools would not have decided to hold the two graduations at First Cathedral. See Exh. 90 ("this was a dead issue until the Family Institute of Connecticut got involved . . . .").  The court does not at this point conclude that Enfield Public Schools adopted the "purpose" of FIC in seeking to move graduations to First Cathedral.  A legislature's purpose need not be equated with a lobbying group's purpose, even if

---

[31]  The court assumes that the "religious liberty" referenced here is the view Wolfgang expressed during his testimony: not holding graduation ceremonies at First Cathedral would constitute a First Amendment violation.  See Wolfgang, Tr. at 295-96.  This view receives no support in either the text of the First Amendment or the long history of First Amendment precedent that binds this court.  Nor does Enfield Public Schools claim that there is a First Amendment right to hold public school graduations at a religious institution.  See Tr. of Oral Arg. at 55.

those lobbying efforts succeeded.  The issue here, however, is not Enfield Public Schools' purpose, but instead the broader context within which a reasonable observer would understand the 2010 graduations.  Given the unity of interest that developed between FIC and the Chairman, FIC's agenda -- and FIC and Chairman Stokes working together on that agenda -- is clearly part of that context.[32]  After FIC and the Chairman began working together to hold graduations at First Cathedral, it is noteworthy that Chairman Stokes framed the decision facing the Board as one in which "[m]orally, ethically and spiritually each Board member will get their vote."  Exh. 40 at 8.

Enfield Schools agrees that the reasonable observer envisioned by relevant precedent would be aware of both the broader contextual background and the finer contextual details of the First Cathedral choice.  See Transcript of Oral Argument ("Tr. of Oral Arg.") at 80.  For its part, Enfield Schools urges that the relevant context would lead a reasonable observer to believe that Enfield was *not* endorsing the views of First Cathedral.  The Board did initially vote on January 26, 2010 to hold graduation ceremonies at the two high schools.  Counsel for Enfield Schools specifically pointed out that a reasonable observer would be aware of this fact, and that Chairman Stokes voted for the January 2010 Motion that brought the graduations "back home."  Id. Enfield argues that public opposition, financial concerns, and apprehension about the amenities at the two high schools led the Board to rescind that decision in February

---

[32] The fact of the Chairman's occupation as pastor at a local church does not somehow render the actions he takes in his capacity as Chairman of the School Board to be religious.  As the plaintiffs, and this court, are quick to acknowledge, a religious official has an absolute right to hold public office.  See McDaniel v. Paty, 435 U.S. 618 (1978).  Nonetheless, in assessing whether a particular policy impermissibly endorses religion, this court must inquire into how a reasonable observer would perceive both the activity itself and its surrounding context, which includes Chairman Stokes' comments and actions.

2010.  See Tr. at 60; Exh. 39 at 6.

Other evidence that Enfield Public Schools highlights is less persuasive, however.  Enfield Schools contends that the April 13 decision was driven by overwhelming student preference.  There is serious doubt as to whether that is so.  In previous years, students at Enfield High disfavored First Cathedral as a graduation site.  See Exh. 34 at 6.  Enfield Schools points only to the "droves" of people that spoke at the 2010 Board Meetings to support its claim about student opinion.  See Exhs. 36, 144.[33]

iv. Conclusion.  A reasonable observer attending the 2010 Enfield graduations would perceive the message that Enfield endorsed the readily perceptible religious views of First Cathedral based upon the character of that forum which Enfield Schools selected.  The context surrounding that decision -- including the FIC's involvement, the statements of Chairman Stokes, statements about "religious liberty" as the reason to return to First Cathedral, the joining together of FIC and the Chairman, and the method by which the Board evaluated First Cathedral and its alternatives -- only amplifies that message.  Here, there was an organization whose self-identified purpose is to support churches, working "on the same page" with the Board Chairman to fight for "religious liberty" by holding graduations at First Cathedral.  Therefore, plaintiffs have clearly demonstrated a substantial likelihood of success in showing that "the practice under review in fact conveys a message of endorsement," and as such constitutes a violation

---

[33] The minutes of the Board meetings do not reflect that description.  See Exhs. 39-41.  Even assuming Enfield's view was correct, however, "we do not count heads before enforcing the First Amendment."  McCreary, 545 U.S. 844, 884 (O'Connor, J. concurring).  Nor does it matter how many people object to holding graduations at First Cathedral, because the First Amendment is not about numbers.

of the Establishment Clause.   Lynch, 465 U.S. at 690 (O'Connor, J., concurring).

b.      Excessive Entanglement

Originally, "[t]he final prong of the Lemon test consider[ed] whether the

challenged government action fosters excessive state entanglement with religion."

Skoros, 437 F.3d at 35 (internal quotation marks and citation omitted).  However, the

Supreme Court has since clarified that the "entanglement" analysis is "properly treated

as an aspect of Lemon's second-prong inquiry into a statute's effect."  Id. at 36 (internal

quotation marks and citations omitted); see also Agostini, 521 U.S. at 232-33.  The

court therefore considers the issue of "excessive entanglement" as part of its analysis

of the Lemon test's second prong.

"'Entanglement is a question of kind and degree.'"  Skoros, 437 F.3d at 36

(quoting Lynch, 465 U.S. at 684).  State entanglement in religion "becomes

constitutionally 'excessive' . . . when it has 'the effect of advancing or inhibiting

religion.'"  Skoros, 437 F.3d at 36 (quoting Agostini, 521 U.S. at 233).  In assessing

entanglement, "a court considers the character and purposes of the institutions that are

benefitted, the nature of the aid that the State provides, and the resulting relationship

between the government and religious authority."  Skoros, 437 F.3d at 36 (internal

quotation marks and citations omitted).  The Second Circuit has recently noted that,

"like the Establishment Clause generally, the prohibition on excessive government

entanglement with religion 'rests upon the premise that both religion and government

can best work to achieve their lofty aims if each is left free from the other within its

respective sphere.'"  Commack Self-Service Kosher Meats, Inc., 294 F.3d at 428

(hereinafter "Commack") (citing Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. 203,

-39-

212 (1948)).[34]  Interactions between state officials and religious officials may bear on whether an excessive entanglement is present.  Indeed, as the Supreme Court has observed, "the core rationale underlying the Establishment clause is preventing 'a fusion of governmental and religious functions.'"  Larkin v. Grendel's Den, Inc., 459 U.S. 116, 126 (1982) (quoting School District of Abington Township v. Schempp, 374 U.S. 203, 222 (1963)).

The Second Circuit has found that excessive entanglement is created when government "take[s] sides in a religious matter . . . ."  Commack, 294 F.3d at 425. Indeed, in concluding there was no constitutionally prohibited "state monitoring of non-government activities," the Skoros court found it critical that the challenged activity did not "attempt . . . to dictate to any private group or person outside the public schools any official view of what are . . . secular or religious symbols . . . ."  Skoros, 437 F.3d at 37. In Commack, the plaintiffs, who owned a food company that "ha[d] been cited for violations of New York's kosher fraud laws on at least four occasions," alleged that such laws on their face violated the Establishment Clause.   Commack, 294 F.3d at 418. The statutory scheme at issue provided for an "advisory board on kosher law enforcement" that was "granted extremely broad powers to advise, counsel, and confer" with the New York State Department of Agriculture and Markets on "matters of policy in connection with administration and enforcement."  While the state argued that the

---

[34] Plaintiffs have urged, and courts have often found, that "divisiveness" is a critical factor within the entanglement analysis.  However, the Supreme Court has held that "we have never relied on divisiveness as an independent ground for holding a government practice unconstitutional," and explained that this is largely due to the fact that "guessing the potential for political divisiveness inherent in a government practice is simply too speculative an enterprise . . . ."  Lynch, 465 U.S. at 689.  This court therefore heeds the warning that, "the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself."  Id.

advisory board did not, in fact, participate in enforcement-related activities, the Second Circuit held that the challenged laws -- and the advisory board itself -- "fail[ed] the excessive entanglement inquiry."  Id. at 428.  Under the statutory scheme at issue, the state was required to take a position "on a matter of religious doctrine" – specifically, whether particular food products were "kosher."  Such decisions were to be made with the guidance of an advisory board whose role was to "advise the Department regarding the requirements of Orthodox Jewish dietary laws," and which was composed of members of that faith.  Id. at 429.

The uneasy process of attempting to "secularize" First Cathedral by covering some of its religious imagery in advance of the June 2010 graduations creates the same kind of excessive entanglement between the Town of Enfield and religion.  The Town of Enfield has planned to cover the several banners that adorn First Cathedral. When asked "[w]ho will be responsible for actually physically covering whatever is covered?", Chairman Stokes testified, "[t]he responsibility to get this done will be the Board of Education as a whole . . . As the old saying goes, the buck stops here. The board will be responsible to make sure it is completed."  Tr. at 167.  The Enfield Board has now passed a resolution stating an "intention regarding modification of the interior of First Cathedral for the 2010 graduation[s]."  Exh. L.  The resolution lists additional items to be covered or removed -- sixteen in all -- including the communion table in the sanctuary, the image of the dove on the podium, and all First Cathedral informational pamphlets.  At Oral Argument, Enfield's counsel indicated First Cathedral staff were expected to be the ones to actually cover up the items.

The act of the state entering a place of worship and directing church staff to

physically cover or remove objects within that space creates constitutional questions.

See Everson v. Board of Education of Ewing Tp., 330 U.S. 1, 16 (1947) ("Neither a

state nor the Federal Government can, openly or secretly, participate in the affairs of

any religious organizations or groups and vice versa.").  In this case, the entanglement

of the state in religious affairs is clear because it requires the state to make judgments

as to what constitutes religious content and what does not.  The May 25, 2010

resolution provides that, "All framed art in the lobby; the upper and lower hallway areas

that are not roped off; the staging area; and the reception area; which contain a

religious image or message will be covered."  Exh. L at ¶ 6.  Further, the resolution

assures that, "Any religious image or message not specifically described above will be

masked or removed if discovered . . . ."  Id. at ¶ 16.  What constitutes a "religious image

or message" will be determined by the Enfield School Board or its agent.  Counsel for

Enfield Public Schools clarified the May 25, 2010 Motion by stating that, where there is

a dispute as to what is or is not a "religious image or message," Chairman Stokes will

render the final decision.  See Tr. of Oral Arg. at 71.

     Holding graduations at First Cathedral has put Enfield Schools in a similar

position where it must "take sides on a religious matter" as in Commack.  Central to the

court's holding there was the fact that real "disputes [as to] the meaning of the term

'kosher'" existed because "rabbinical authorities differed in their interpretations of

specific laws."  Id. at 426.  That government acted to resolve those disputes created an

excessive entanglement.  Id.  There is ample evidence in this record to support the

conclusion that there are disputes as to what images, symbols, and iconography are

Christian.  The Reverend Dr. Frank Kirkpatrick offered testimony and a Declaration

-42-

which contrasted sharply with the views of Archbishop Bailey of First Cathedral.[35]  See Kirkpatrick Dep., Exh. 134; Tr. at 7-15; Bailey Dep.  That Enfield will choose which of these objects is sufficiently religious to warrant covering renders this arrangement an excessive entanglement of state and religion, for it requires Enfield to take a position on religious doctrine.  See supra, at 7.

The entanglement between religion and the state present here is more severe than the entanglement present in recent Supreme Court cases that have found no constitutional violation exists.  Compare Agostini, 521 U.S. 203 (concluding that New York City's Title I program did not create an excessive entanglement solely on the basis of unannounced monthly visits of public supervisors to religious venues); Bowen v. Kendrick, 487 U.S. 589, 616 (1988) (declining to find monitoring by state officials of grants to programs that were not "pervasively sectarian" created excessive entanglement).  In this case, Enfield is not only monitoring a "pervasively sectarian" First Cathedral on graduation day: it is actively modifying the church by covering religious objects within it, and making the determination as to which objects are religious.  Further, there is no distinction to be drawn between Commack and the facts of this case on the basis that Commack struck down a statute that allowed the state to weigh in on what is "kosher," whereas this case requires the state to decide what

---

[35] For example, Reverend Kirkpatrick believes the fountain in the lobby represented a baptismal font, but Bailey does not; Kirkpatrick believes Jesus Christ is represented by a dove, but Bailey does not; Kirkpatrick believes the fish depicted in the carpet "represent[s] one of the most important symbols in the Christian tradition," but Bailey does not; Kirkpatrick believes the image of the chalice embodies "the blood of Jesus which Christians believe he shed for humankind at his crucifixion," but Bailey believes it represents "community."  Although the two religious officials agree that the cross is a Christian symbol, the record is replete with evidence that there are significant disagreements as to which symbols and images have religious meaning, and which do not.  The imagery referenced in paragraph six of the affidavit is particularly controversial, as it depicts historical scenes, biblical parables, and passages from scripture, which Bailey characterizes as "eclectic" and "not religious."

constitutes a "religious image or message." In each instance, the state voices its view on what the record clearly establishes are disputed religious matters.

Obviously, Enfield Public Schools is planning to cover up objects in an attempt to vitiate any Establishment Clause violation of endorsement of religion arising out of its decision to hold the graduations at First Cathedral. In trying to do so, however, it has created another basis for such a violation – excessive entanglement. Paraphrasing Justice Kennedy in Lee:

> "The school's explanation [that giving First Cathedral direction to cover objects was a good faith attempt by the school to ensure that sectarianism . . . be removed from the graduation ceremony] however, does not resolve the dilemma caused by its participation. The question is not the good faith of the school in attempting to make [First Cathedral] acceptable to most persons, but the legitimacy of it undertaking that enterprise at all when the object is to [hold a graduation ceremony at a church]."

Lee, 505 U.S. at 588-89.

In Establishment Clause cases, "[i]t must not be forgotten . . . that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference." Lee, 505 U.S. at 589. The nature and degree of Enfield Schools' modifications of religious items within First Cathedral, as well as the nature and degree of Enfield's intrusion into religious matters, constitutes an excessive entanglement by the state into religion. Plaintiffs have made a substantial showing that they will likely prevail in establishing an Establishment Clause violation based on the effect prong of the Lemon test because of excessive entanglement.

-44-

c.    Coercion

"It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." Lee, 505 U.S. at 587.  Plaintiffs urge that forcing people to choose between attending a public school function at First Cathedral, and missing high school graduation ceremonies, causes precisely the kind of coercion that violates the Establishment Clause.  Enfield Schools contends that there is no religious activity that occurs during graduation ceremonies and that this distinguishes the circumstances of this case from those other cases in which courts have struck down policies as unconstitutionally coercive.

The court's coercion analysis begins by noting the fact that the challenged activity occurs within the secondary school context.  The Supreme Court has consistently treated public schools as distinct from other contexts within First Amendment jurisprudence.  See, e.g., Schempp, 374 U.S. at 307; Engel v. Vitale, 370 U.S. 421 (1962).  This is particularly true in evaluating the coercive effect of a particular program, as "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."  Lee, 505 U.S. at 592 (acknowledging that "[b]y the time they are seniors, high school students no doubt have been required to attend classes and assemblies and to complete assignments exposing them to ideas they find distasteful or immoral or absurd or all of these," but concluding that the context of a secondary school's graduation nonetheless bears on the coercive force of a challenged policy).

In Lee, the Supreme Court held that state officials directing the performance of a

-45-

formal religious exercise at graduation ceremonies for secondary schools was unconstitutional.  505 U.S. at  586.  Although attendance at graduation was not mandatory, the court declined to extend any weight to this fact, instead determining that "[e]veryone knows that in our society and in our culture high school graduation is one of life's most significant occasions," and that "a student is not free to absent herself from the graduation exercise in any real sense of the term 'voluntary' . . . ."  Id. at 595.  Participation in the benediction was not compulsory either, but the court similarly concluded that this did not cure the constitutional infirmity of the school's actions.  Id.  This view was affirmed in the subsequent case of Santa Fe Independent School District v. Doe, where the Court again found that a benediction prayer at a public secondary school – that was made at an event at which attendance was not mandatory and that was implemented in a manner that did not require student participation – violated the Establishment Clause.  530 U.S. 290.

Lee and Santa Fe demonstrate that integrating religious activity into seminal public school events violates the Establishment Clause even when attendance and participation are not mandated by the school.  Indeed, "[t]he Constitution forbids the State to exact religious conformity from a student as the price of attending her own high school graduation." Lee, 505 U.S. at 596.  Yet in so finding, the Supreme Court clarified that it did not "hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation."  Id. at 598.  The critical question, it then seems, is whether "the conformity required of the student [in a given case is] too high an exaction to withstand the test of the

Establishment Clause."  Id.

The court concludes that holding 2010 graduations at First Cathedral would require a conformity of the graduating seniors at Enfield and Fermi high schools that is "too high an exaction" to withstand constitutional scrutiny.  Like the students in Lee and Santa Fe, students in this case cannot be said to have a real choice to absent themselves from their own graduations.  Effectively then, Enfield Public Schools has required those students to attend First Cathedral, to invite family and friends to join them at First Cathedral, to enter a building dominated by a large white cross and designated on a large sign as "First Cathedral," to pass under the large cross that marks its entrance, and to remain in the sanctuary -- and view the large cross that serves as the sanctuary's focal point -- for the duration of the graduation ceremonies.  That Enfield Public Schools forces students to participate in these acts violates the Establishment Clause's benchmark that "government may not coerce anyone to support or participate in religion or its exercise.'"  Altman, 245 F.3d at 75 (citations omitted).

Enfield Public Schools urges, and the court agrees, that the circumstances of this case differ from the facts of both Lee and Santa Fe.  Each of those cases involved actual prayer being performed at a public school event.  In this case, there will be no prayer or religious service at any point during the graduation ceremonies, or any participation by a religious figure.  Enfield Schools contends that this distinction is determinative, and that the absence of active prayer insulates the Enfield graduation plans from any constitutional challenge on coercion grounds.  However, that there will be no prayer service performed or sponsored by school officials during graduation ceremonies does not put an end to plaintiffs' coercion claim.  No case specifically limits

the application of coercion to those instances in which prayer or worship services occur. Guiding this court's decision is the language in Lee that the "government may not coerce anyone to support or participate in religion or its exercise.'" Lee, 505 U.S. at 587 (emphasis added).  Holding public school graduations in a church, designated as such and dominated by religious symbols, coerces graduating seniors and their guests to support religion, specifically First Cathedral and what it represents.

That there will not be prayer at the 2010 graduations also does not lead to the conclusion that attendance at First Cathedral for graduation ceremonies will not be "religious activity."  Plaintiffs contend, and the defendants do not dispute, that some believers see entering a church as a religious act in itself.  See Motion for Preliminary Injunction at 23 (citing The Latin Mass Society of England and Wales, *The Kingdom of the Beloved Son*, *available at* www.latin-mass-society.org/2007/kingdom.html ("To pass through the door of a church already constitutes a religious act which signifies entry into the sacred.  A church is the temple of God.  It is not a meeting place of men but the place of worship of God.").

It also appears that entering a Christian church is prohibited for some persons of the Jewish faith.  For some Jews, it is "forbidden to enter the sanctuary of a church, even when prayer is not conducted."  Id. at 24 (citing Rabbi Chaim Tabasky, *Prohibition to Be in a Church*, Yeshiva.Org.Il, May 27, 2008, www.yeshiva.org.il/ask/eng/print.asp?id=3859.).  Viewed through this lens, holding graduations at First Cathedral not only can be viewed as coercing students to enter a church and "support or participate in religion," but can also be viewed as coercing the violation of one's own religious beliefs.

While Enfield Public Schools argues that the sole meaningful distinction between the circumstances of this case and the facts of Lee and Santa Fe is the absence of prayer in this case, another critical distinction bears noting.  In Lee and Santa Fe, the state did not require that individual students perform any act whatsoever, but instead merely required students to be exposed to others engaging in religious activity at secular venues.  In this case, however, holding graduations at First Cathedral requires students to enter First Cathedral, a place that the church itself states is "God's house where Jesus Christ is Lord."  Exh. 2-5.  To the extent that Lee and Santa Fe involved challenged action that required only passive observance -- whereas Enfield Public Schools requires students to undertake the act of entering a place of religious worship -- holding 2010 graduations at First Cathedral seems *more* coercive than the passive, silent observance of the benediction prayers of Lee and Santa Fe.

Plaintiffs have demonstrated a substantial likelihood of success that the 2010 Enfield graduations will require the Does to support religion.  That Doe 1 and 3 will not have to sit through a prayer does not diminish the fact that they are coerced into supporting religion in order to participate in their high school graduations.  This has the effect of advancing, or inhibiting, religion, thus violating the Establishment Clause.

d.      Conclusion

Having considered all three analytical frameworks for determining whether the government action at issue has a principal effect that neither advances nor inhibits religion, the court concludes that it does not have such an effect, and therefore violates the Establishment Clause.  By holding public high school graduations in an identifiable church, under the circumstances and context of this situation that would be known to a

-49-

reasonable observer, Enfield Public Schools endorses religion.  By attempting to

"neutralize" the First Cathedral by covering up many (albeit not all) of its religious

images, Enfield Public Schools unconstitutionally entangles itself with religion.  And

finally, by requiring a graduating senior -- or a parent of one -- to enter First Cathedral in

order to be able to participate in his or her graduation -- or to watch their child graduate

-- Enfield Public Schools has coerced plaintiffs to support religion.

       C.      <u>Claim Under Article Seventh of the Connecticut Constitution</u>

In light of the court's conclusion that holding the 2010 Enfield Public Schools'

graduation ceremonies at First Cathedral violates the Establishment Clause of the First

Amendment, it is unnecessary for the court to inquire as to whether that action would

also violate Article Seventh of the Connecticut Constitution.

**IV.**    **CONCLUSION**

For the foregoing reasons, this court concludes that plaintiffs have clearly

demonstrated a substantial likelihood of success on the merits of their First Amendment

claim concerning the holding of the 2010 graduation for Enfield High School and Enrico

Fermi High School at First Cathedral.  The plaintiffs have done so with regard to the

second prong of the <u>Lemon</u> test, as it is applied using all three "aspects" of that prong

under current case law: endorsement, entanglement, and coercion.

In reaching this decision, the court recognizes that likely many members of the

graduating classes -- and their family and friends -- belong to a religion and participate

in religious practices.  As Justice Kennedy said in <u>Lee</u>, "[W]e acknowledge the profound

belief of adherents to many faiths that there must be a place in the student's life for

precepts of a morality higher even than the law we today enforce."  Lee, 505 U.S. at 598.  While agreeing with that principle, it is the conclusion of this court that that "place" is not graduation night at First Cathedral for Enfield High School or Enrico Fermi High School.

Plaintiffs' Motion for Preliminary Injunction (Doc. No. 5) is hereby **GRANTED**. The defendant, Enfield Public Schools, is hereby preliminarily enjoined from holding the 2010 graduation ceremonies for Enfield High School and Enrico Fermi High School at First Cathedral.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 31st day of May, 2010.


        /s/ Janet C. Hall
Janet C. Hall
United States District Judge